[Crim. No. 1448. Fourth Dist. Oct. 25, 1960.]

THE PEOPLE, Respondent, v. BARNEY McCOY
BARNHILL, Appellant.

Barney McCoy Barnhill, in pro. per., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David R. Cadwell, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—Defendant-appellant was accused in a grand jury indictment of the crime of murder of his wife, Carrie Barnhill, and he was convicted by a jury of that offense. The degree was fixed at first degree murder. His motion for a new trial was denied. While represented by his counsel, he entered a plea of not guilty and not guilty by reason of insanity. Subsequently the latter plea was withdrawn.

Raymond Fleetwood, a taxicab driver in the city of San Diego, received a call about 9 p.m. on August 10, 1959, to pick up a passenger at a certain hotel. He entered the hotel and observed defendant carrying a filled shopping bag with handles on it. Defendant asked the cab driver to take him to the Hayloft Barbecue in Chula Vista and said he was going to this place to see his wife who worked there and that he wanted to talk his wife into dropping a divorce action and coming back to him. They arrived at the Hayloft about 9:30 p.m. and defendant asked the driver to wait until traffic thinned down and people left before going in. He sent the driver into the café to buy a Coca-Cola and on his return defendant asked him for a description of the waitress. Fleetwood described the waitress and defendant said that that was his wife. Defendant had the driver enter and start ordering his dinner. Defendant later came in with a shoe box and when within 6 feet of his wife, the deceased, his wife became quite concerned, turned and left toward the kitchen. Defendant followed her and said, ''Here is $3,000.00 for you.'' His wife stepped back and said she didn't want any presents from him. The cab driver then heard defendant say, ''I have something else for you'' and defendant reached under his coat. He was practically against deceased when he said these words. A shot was fired and a witness heard the deceased say, ''He shot me'' and observed defendant turn with the gun in his hand, which gun was pointed in the general direction of the deceased. The owner of the premises jumped at defendant and just then a second shot was fired and his wife's body slumped to the floor. A busboy began scuffling with defendant for the gun and a third shot was fired. Sheriff's officers were called and defendant was restrained and disarmed by onlookers with some difficulty. Defendant threatened to shoot the owner if he did not release the gun to defendant. It was a .38 caliber Smith & Wesson revolver. Apparently the defendant had been hurt in the scuffle. He told the deputy sheriff he had shot his wife because he loved her. He seemed to be responsive to

questions propounded to him and answered promptly. He also said, when asked if he had shot his wife, "I did my best" and remarked that he had shot her twice. Defendant left the shopping bag in the taxicab, which bag contained one-fourth of a pint of whiskey and an envelope containing six rounds of .38 caliber ammunition. In the shoe box was found a packet of letters, but no currency or money.

In the hospital defendant stated that he had decided to kill the deceased the day before, when he bought the bullets, and that he had been planning to kill himself for two weeks, but the day before he decided to "destroy" both of them if he could not get his wife back.

In another lengthy conversation in the hospital, he told the officers, "I was married before and I have four daughters and I have been a good man, I have served on juries." The officers said, "but why did you shoot her?" and he said, "She was mean to me," and stated that "one morning or one day she disappeared on me; I found her out here in California." When asked by the officers when he first decided to shoot her, he replied that that was the time when she had talked mean to him on the telephone. He stated that at that time he decided to shoot her.

A physician in the hospital said that defendant told him that most of his troubles began in December of 1958, when his wife left him; that he tried to effect a reconciliation but was unsuccessful; that he "couldn't take it any longer," and he intended to shoot her as well as himself; that he bought a gun in Florida and he had thought over the shooting for several weeks before he decided to do it.

The autopsy surgeon testified that in his opinion the cause of death of the deceased was a massive hemorrhage from a gunshot wound of the left chest and abdomen, with perforations through the heart, the liver, the pancreas and the spine.

In defense, defendant testified that he first met deceased on August 19, 1957, in Florida; that he married her on July 19, 1958, and between these times he was married to another lady; that he and deceased separated on December 29, 1958, and that he next saw deceased at Imperial Beach on July 1, 1959, talked with her awhile on that day and that he remained in California for approximately a week at that time; that on July 2 he took her to dinner and after that she wouldn't let him see her again, although he tried to talk to her on the telephone several times; that subsequently he returned to Florida and prior to leaving for California the first time he

had bought a gun as well as 12 bullets in Florida; that he returned to California for the second time on August 6; that on August 9 he went to a hotel, undressed and went to bed; that he did not have in his possession the sum of $3,000 or any sum of money close to that; that he awakened the morning of August 10, went out to obtain something to eat, went back to the hotel and later called a taxicab; that he was then carrying a shopping bag in which he had all the letters which Carrie had written to him, as well as the gun and a half pint of whiskey; that when he called the cab he had made up his mind to kill himself; that after the cab went to the Hayloft Barbecue he got out and put the gun under his belt; that he took the shoe box of letters with him; that as the deceased turned from taking the cab driver's order, he walked up to her and said, ''Carrie, I've got a package here I want to give you. I have seen the time that part of this package was worth $3,000.00 to me''; that the deceased replied, ''I don't want it; take it out of here''; that then ''the whole world turned black'' to him and the next thing he knew there was a man grabbing him by the arms and neck; that he then attempted with all his strength to place the gun at his heart and pull the trigger and that he did not know whether or not he had shot the deceased. Defendant's daughter testified that in 1959 defendant had a stroke and that between December 1958 and August 1959 she many times observed that defendant had mental black-outs, including loss of knowledge of his surroundings and she observed him ''go to pieces,'' especially when looking at pictures.

 Defendant filed his notice of appeal and opening brief in propria persona. The first argument of error is that the remarks of the trial court, at the opening of the case, in stating several instructions to the jury in respect to their general duties as jurors and the general laws in reference to homicide, constituted error. Among them was a statement that the jurors should not try the complaining witness, police officers, attorneys, judge or anyone else except the defendant; that the defendant was the one on trial and if they believed defendant to be guilty, beyond a reasonable doubt, they should convict, and if not they should acquit. Defendant complains, stating that this instruction told the jury that the court expected them to believe those testifying for the state, unless it was shown, by a preponderance of the evidence, that the witness was in error, thus making it the duty of defendant

to prove his innocence. We do not believe the instructions given are susceptible of this construction. Further complaint is made because the instructions were given at the beginning of the trial, when they should have been given at the close.

Section 1093, Penal Code, subdivision 6, provides in part: "At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as he may deem necessary for their guidance on hearing the case."

No error appears in this respect. (*People* v. *Tennant*, 32 Cal.App.2d 1 [88 P.2d 937].) Defendant did not request that all of the instructions subsequently given be made a part of the transcript on appeal. No error in the instructions appears from the record as prepared. (*People* v. *Letourneau*, 34 Cal.2d 478, 493 [211 P.2d 865]; rule 33, Rules on Appeal; *People* v. *Wells*, 68 Cal.App.2d 476, 480 [156 P.2d 979].)

 The defendant complains of many remarks made by the trial judge during the course of the trial. The first remark cited as error occurred at the conclusion of an examination of a doctor, out of the presence of the jury, as to the mental and physical ability of defendant to carry on with the trial. Defendant had appeared emotional, and the court asked the doctor whether or not anybody hearing the statements made by the district attorney in his opening comment to the jury would feel emotional and the doctor replied "Yes." The court then offered the statement, "I can say this, Mr. Thomas, if I had been sitting down there where Mr. Barnhill is and you related the same things to the jury about me that you did about him I would be very emotional, I am sure." Defendant has pointed out no way in which this remark could be considered prejudicial to him. Furthermore, the jury was not present in the courtroom. Another remark of the trial judge was made in response to an objection by the prosecuting attorney. Defendant was testifying that before he had bought the murder weapon he had awakened one morning hearing "Carrie's voice saying 'Get rid of us, Barney.'" and this voice "ran him crazy." The prosecutor objected that this was self-serving hearsay and the court replied, "Absolutely self-serving." It is perfectly proper for a trial judge to give a valid reason for a ruling on the admissibility of evidence, and such statements are not prejudicial. (*People* v. *Vukich*, 201 Cal. 290, 298 [257 P. 46]; *People* v. *Pierson*, 69 Cal.App.2d

285, 296 [159 P.2d 39].) Most of defendant's remaining claims, in this respect, cover the remarks of the trial judge made during the course of the trial as to defendant's conduct during the trial. Several times defendant made statements not called for by questions put to him. These statements portrayed him as being afflicted with remorse over the death of his wife, of being afflicted with fear and emotional distress throughout the days preceding the death of his wife, of being emotionally distressed on the day of the shooting and also during the trial, and, finally, of his having complete faith in the ability and intelligence of the jury. After making many of these statements, the court instructed defendant to discontinue this course of conduct. The court stated several times that defendant was "making a speech," was "putting on a show," and that it was his opinion that the defendant was deliberately making these comments in order to influence the jury. Whether some of these remarks of the trial judge were necessary is open to conjecture. The trial judge could better determine that question. It is the general rule that it is the duty of the judge in the administration of justice to preserve the order of the court and to see that all persons whosoever, including the defendant, indulge in no act or conduct calculated to obstruct the administration of justice. (*People* v. *Harris,* 45 Cal.App. 547, 552 [188 P. 65]; *People* v. *McNeer,* 8 Cal.App.2d 676 [47 P.2d 813]; *People* v. *Merkouris,* 46 Cal.2d 540, 556 [297 P.2d 999].) From the undisputed evidence produced of defendant's guilt, we conclude that no prejudicial error resulted. (Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

Certain remarks of the district attorney are cited as error or prejudicial misconduct. They involve certain claimed leading questions asked the witnesses. The allowance of leading questions is usually controlled by the trial court. None of those pointed out seemed to indicate any prejudicial error. (*People* v. *Weber,* 149 Cal. 325, 338 [86 P. 871].)

 The district attorney did state to the jury that he had read all of the letters found in the shoe box and that they were all about the same. Only one letter was admitted in evidence. It was error for the district attorney to thus "testify" in the case, but the court had this remark stricken. Other questions and answers about which defendant objects were likewise ordered stricken from the record and the jury was ordered to disregard them. We will assume that the jury did disregard the remarks. (*People* v. *Jones,* 116 Cal.App. 432, 438 [2 P.2d

818].) Other remarks are claimed to be prejudicial. Suffice to say, we have examined the entire record and evidence produced and conclude that no prejudicial error resulted. (*People* v. *Hoyt*, 20 Cal.2d 306, 318 [125 P.2d 29]; *People* v. *Evans*, 113 Cal.App.2d 124, 127 [247 P.2d 915].)

Next, defendant proclaims that he was deprived of due process of law by failure of the record on appeal to include the closing argument of the district attorney and of defense counsel. He intimates that in his argument the prosecutor made statements that were not in accord with the testimony. Defendant having failed to request such record at the time of his appeal, he cannot now, in his brief, for the first time, make such request, particularly where there is no showing of any prejudicial error in respect to the argument. (Rule 33, Rules on Appeal, *supra*; *People* v. *Wells*, *supra*, 68 Cal.App. 2d 476, 480 [156 P.2d 979]; *People* v. *Hernandez*, 150 Cal. App.2d 398, 402 [309 P.2d 969].)

Lastly, defendant makes some claim in his brief that he was not permitted to have a physical examination by a doctor of his own choice prior to the trial and that the court denied issuance of a subpoena for a certain witness to testify for him. The record before us does not bear out this claim. California courts have consistently refused to consider allegations of error when those allegations are not supported by anything in the record, but are supported merely by statements in defendant's brief. (*People* v. *Hernandez*, *supra*, 150 Cal.App. 2d 398, 402 [309 P.2d 969]; *People* v. *Villarico*, 140 Cal.App. 2d 233, 236 [295 P.2d 76].)

In his closing brief, defendant asserts, for the first time, that he was, prior to and during the trial, insane, and that it was the duty of the trial judge to postpone further proceedings until the question of his sanity had been determined according to law. (Citing Fricke, California Criminal Procedure, 5th ed., p. 204, 205.) He claims he had a stroke and was confined to the hospital prior to the time of the commission of the crime and that the trial court should have made a determination of his present sanity, and accordingly he was denied due process of law and the court lacked jurisdiction to proceed. He further argues that he was represented by a court-appointed counsel at the trial whose services were not fully effective.

It does appear that during the trial defendant appeared to have fainted in the court room. The jury was excused and the following day, at the instance of the trial judge, a doctor who

examined defendant reported that defendant was both physically and mentally capable of proceeding with the trial. No objection thereto was made by defendant or his counsel and no witnesses were offered by defendant on the subject. At the outset of the trial, defendant and his counsel withdrew the plea of not guilty by reason of insanity and defendant's counsel stated that all of the psychiatrists who examined defendant had reached the conclusion that he was sane and said, ''There isn't a question of insanity involved there.'' The trial court was justified in proceeding with the trial to its conclusion. There is no indication that counsel who represented defendant was not capable or competent. Considering the overwhelming evidence against the defendant, it appears that he received a fair trial and that no prejudice resulted.

Judgment and order denying a new trial affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 22, 1960.