[Crim. No. 4285. First Dist., Div. One. May 27, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS NORMAN LINDSAY, Defendant and Appellant.

Andrew P. Smirnoff, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., Edward P. O'Brien anl Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—Defendant, who was found guilty by a jury on 17 of 22 counts of an indictment,[1] appeals from the judgment of conviction. Counts 1 to 7, inclusive, charge offenses allegedly perpetrated upon the person and against the property of Miss R; Counts 8 to 16, inclusive, upon the persons of Mr. M and Miss S; Counts 17 to 20, inclusive, upon the persons of Miss K and Mrs. K, and the property of Mrs. K; and Counts 21 and 22, upon the person and property of Miss C. Preliminary to a discussion of the questions raised on appeal we proceed to discuss the nature of these counts and the facts pertinent to the commission of the crimes

---

[1]Defendant was also charged with two prior felony convictions which he admitted on arraignment.

charged. In doing so, we shall treat the four occurrences, which are the subject of the indictment, under the four separate headings which immediately follow.

## The "R" Counts

Defendant was found guilty on five of the seven counts applicable to Miss R. He was convicted of counts charging a violation of the following Penal Code sections: Count 1, section 459 (burglary); Count 2, section 288a (sex perversion); Count 3, section 261, subdivision 4 (rape); Count 4, section 261, subdivision 4 (rape); and Count 7, section 211 (robbery).[2] The facts related to these counts follow:

On October 17, 1961, Miss R was awakened shortly after going to bed around 11 p.m. by a flashlight shining in her face. A man was standing inside her bedroom door with the flashlight in one hand and a knife in the other. He said, " 'Don't scream. Do you want to get hurt? Do you want to get hurt?' " He was wearing cotton garden gloves. He approached the bed, removed the covers and placed a pillow over her head. When she asked him to remove it, he slipped the pillowcase off and covered her face with it. He undressed and got in bed with her. After he was in bed, he began feeling Miss R's private parts and tried to kiss her. He forced her to orally copulate him and then forced her to engage in sexual intercourse with him. Following this act of sexual intercourse, Miss R was bleeding and had to use the bathroom. The man accompanied her to the bathroom and upon returning he again forced her to engage in an act of sexual intercourse. After this second act of intercourse, he covered Miss R's face, dressed himself, tied her up and went to a dresser where he took some money from her purse. He inquired where her valuables and cameras were and she replied that she did not know. He said, " 'Well if I don't find them, I will come back to you.' "

At 4:54 a.m. an officer at the Redwood City Police Department received a telephone call from a man who said, " 'Take this down the first time. I am only going to tell you once. There is a girl at the ... [R] residence on Hardwick Road that is badly hurt and needs help. . . .' " Two deputies answered the call and in a bedroom they found Miss R tied hand and foot kneeling at the end of the bed. There were cuts about her face and breasts; her face, shoulders, breasts,

---

[2]Defendant was acquitted on Counts 5 and 6 charging a violation of Pen. Code, § 261, subd. 3 (rape).

and body down to her waist were bloody. The doorjamb on the door to the bedroom had been broken and the striker was on the floor. The room was in disarray and looked as if it had been ransacked. In the hallway outside the bedroom the officers found a butcher knife.

### The "M" and "S" Counts

With respect to these counts, defendant was found guilty on seven and acquitted on two.[3] The convictions were upon counts charging a violation of the following Penal Code sections: Count 8, section 209 (kidnaping for purpose of robbery); Count 10, section 209 (kidnaping for purpose of robbery); Count 12, section 261, subdivision 3 (rape); Count 13, section 286 (sodomy); Count 14, section 664 (attempted sex perversion); Count 15, section 211 (robbery); and Count 16, section 211 (robbery).[4] The evidence adduced on these counts follows.

On the night of October 24, 1961, Mr. M and Miss S drove to the area of the Pulgas Water Temple in San Mateo County. When they were about to leave a masked man, wearing gloves and holding a gun, came running up to their car. He ordered Mr. M out of the car and locked him in the trunk. The man then drove the car for a while, and about this time he ordered Miss S to put her head down on his lap so she would not be seen. While they were driving, her skirt started to slip up and when she pulled it back down, he pulled it back up. When she attempted to pull it down again, he slapped her and told her not to do that again. He then pulled the car down into a dirt road and parked it, whereupon he blindfolded her. He forced her head down and tried to place his penis in her mouth but he failed because she clenched her teeth. He ordered her to remove her clothing and then forced her to engage in an act of sexual intercourse. He then told her to turn over on her stomach and tried to put his private parts into her rectum. Initially he did not succeed, but when he struck her on the back and she fell to a prone position, he was able to complete the act. After completing this act, he tied her wrists and ankles and gagged her, and then he got out of the car. He took her purse and removed the money from it and some papers. The assailant

---

[3]Defendant was acquitted on Counts 9 and 11, each charging a violation of Pen. Code, § 207 (kidnaping).

[4]Counts 10 and 16 charge crimes against the person of Mr. M; and Counts 8, 12, 13, 14 and 15 against the person of Miss S.

thereupon cut through the boot of the car and demanded Mr. M's wallet. The wallet contained no money. After obtaining the wallet defendant told Miss S not to scream or say anything because he could see for a distance and he would shoot. Thereafter he removed the gag from her mouth and left.

## The "K" Counts

The jury found defendant guilty on three of these four counts.[5] The counts upon which he was convicted charged a violation of the following Penal Code sections: Count 17, section 459 (burglary); Count 18, section 211 (robbery); and Count 19, section 261, subdivision 3 (rape).[6] The pertinent evidence adduced with respect to the commission of these crimes is as follows.

About 4 p.m. on December 20, 1960, the doorbell to the K residence rang and Mrs. K went to the front door. A man at the door forced his way into the house and ordered both Mrs. K and her daughter, Miss K, into the den, where he forced them to lie face down and bound their hands behind them with adhesive tape. The man had a knife in his hand. He asked them for their money and was told by Mrs. K that it was in her purse. After he obtained the money, he returned to the den and drew the venetian blinds and the drapes. In reply to his question Miss K told him she had some money in her purse in the kitchen. He then asked if there was any money in the bedroom, and when Mrs. K said no, he told them that if there were money there, they would be in trouble. Returning from the bedroom he said he found some money. He was holding two pillow cases which he put over their heads. The man then turned Miss K over on her back and when she screamed, he hit her. He pulled at her clothes and she lost consciousness. Mrs. K heard the struggle between her daughter and the man, and, upon hearing a dull blow, fainted. When Mrs. K regained consciousness the assailant was gone. A physician testified that at about 5 p.m. on December 20, he examined Miss K's genital organs; that he found male spermatozoa in the upper vaginal area; and that there had been penetration of the vagina.

[5]Defendant was acquitted on Count 20 charging rape upon Miss K (violation Pen. Code, § 261, subd. 4).

[6]Count 17 charges a crime against the property and person of Mrs. K and Miss K; Count 18 against the person of Mrs. K; and Count 19 against the person of Miss K.

## The "C" Counts

Defendant was found guilty of both counts charging offenses with respect to Miss C. These counts (Nos. 21 and 22) respectively charged violations of Penal Code sections 459 (burglary) and 245 (assault with a deadly weapon). The facts presented in connection with the commission of these offenses are as follows:

On December 19, 1960, about noontime, a man came to the front door of the C residence, knocked and when Miss C answered the door, asked her if a certain person lived there. When she replied no, he left. Several minutes later she received a telephone call from a man. About an hour later, the same man who had previously knocked at the door returned and knocked again. Between the telephone call and the second visit by the stranger, Miss C had locked all the doors to the house. When the man returned, she called the police. The man then proceeded around the house and began knocking on the kitchen door. She then saw the man inside the house. He was armed with a knife, the point of which he held against her thigh. He took her to her parents' bedroom. The stranger asked her if she had called the police; and when she replied that she had he told her to stay on the bed and then left.

## Was There an Improper Joinder of the "M"-"S" Crimes With the Other Counts?

*No.* The trial court denied defendant's motion to sever the M-S counts from the others for purposes of trial. It is defendant's contention that such a denial amounted to an abuse of discretion.

An accusatory pleading may charge "two or more different offenses connected together in their commission" or "two or more different offenses of the same class of crimes. . . ." (Pen. Code, § 954.) In *People* v. *Thorn,* 138 Cal.App. 714, 734-735 [33 P.2d 5], cited with approval in *People* v. *Duane,* 21 Cal.2d 71, 77 [130 P.2d 123], the reviewing court, in discussing the meaning of the phrase "the same class of crimes or offenses," stated: "The legislature . . . meant by the use of the words . . . offenses possessing common characteristics or attributes. . . ." The cases construing Penal Code section 954 have uniformly allowed joinder of several offenses for trial, " 'even though they do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of sub-

stantial importance in their commission.'" (*People* v. *Kemp,* 55 Cal.2d 458, 475 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Chessman,* 52 Cal.2d 467, 492 [341 P.2d 679]; *In re Pearson,* 30 Cal.2d 871, 873-874 [186 P.2d 401]; *People* v. *Scott,* 24 Cal.2d 774, 778-779 [151 P.2d 517]; *People* v. *Duane, supra,* at pp. 76-78; *People* v. *Kelly,* 203 Cal. 128, 133-135 [263 P. 226].) In *Kemp,* offenses involving murder of one woman, rape and kidnaping of another woman, and a charge of rape of a third woman, were held properly joined. The *Chessman* case approved the joinder of offenses involving store robberies with counts of robberies involving kidnaping and sex crimes. Similarly, in *People* v. *Walker,* 112 Cal.App.2d 462 [246 P.2d 1009], the reviewing court held that the trial court acted within the proper exercise of its discretion in overruling a demurrer to an accusatory pleading which, in separate counts, charged the defendant with the murder of one Richard Cook, the murder and kidnaping of Doris Cook, assault with intent to commit rape on Doris Cook, assault with a deadly weapon upon James Hicks, and with the kidnaping and rape of Betty Maund.

Applying the rationale of these cases to the case at bench, we conclude that the ruling of the trial court in permitting the joinder was within its discretion. The offenses charged in the indictment were not unrelated. To the contrary, they possess common elements of substantial importance. The element of intent to feloniously obtain property "runs like a single thread through the various offenses" (see *People* v. *Chessman, supra,* at p. 492); and aside from the C incident, the intent to satisfy sexual desires runs through all of the other occurrences. Moreover, the charges of rape, sex perversion and sodomy clearly belong to the same class of crimes, and the same is true of kidnaping, robbery and assault with a deadly weapon. Furthermore, all of these crimes are a form of assault and all are offenses against the person. (See Pen. Code, tit. VIII, §§ 187-260, inc.) As for the burglary, while it is classed as a crime against property (see Pen. Code, tit. XIII, §§ 447-455, inc.), as charged in the instant case it possesses a common element of substantial importance with the other offenses in that it is charged as having taken place with the intent to commit theft,[7] robbery,[8] rape,[9] and assault.[10]

---

[7]In the R, K and C counts.

[8]In the R and K counts.

[9]In the R and K counts.

[10]In the K and C counts.

It is significant, moreover, that there was a common *modus operandi* in all of these crimes. Each occurrence involved violent conduct directed against women who were alone and unprotected, except in the M-S incident, and there the woman was quickly rendered defenseless. Except for the C incident, sexual violations were common to each occurrence. In every instance the assailant brandished a knife or gun. Aside from the C occurrence, physical brutality, consisting of punching or slapping, was inflicted upon the women and their hands were bound.[11] In the R and M-S occurrences the assailant wore gloves.

Defendant asserts that ''[i]t would have been nearly impossible for the jury to have isolated the ... [M-S] case from the mass of facts that were presented and have come to a separate verdict.'' This bald assertion is mere speculation and surmise in the absence of any showing of prejudice. ▇ A mere assertion of a fact does not prove it. (*People* v. *Kemp, supra,* 55 Cal.2d 458, 477.) One who asserts prejudice because of a joint trial assumes the burden of proving it. (*People* v. *Kemp, supra,* at p. 477; *People* v. *Duane, supra,* 21 Cal.2d 71, 78; *People* v. *Northcott,* 209 Cal. 639, 648 [289 P. 634, 70 A.L.R. 806].)

*Was the Evidence Sufficient to Identify Defendant as the*
 *Perpetrator of the Offenses and to Connect Him With*
 *Their Commission?*

*Yes.* Defendant does not challenge the sufficiency of the evidence as to each count to establish that the crime embraced therein was in fact committed by some person. He contends, however, that the evidence was insufficient to identify him as the perpetrator of any of the offenses or to connect him with their commission. It is defendant's assertion that the evidence adduced tending to identify him as the perpetrator was vague and contradictory, and of such quality as to render it inadequate as a matter of law.

▇ Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all. (*People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402]; *People* v. *Jackson,* 183 Cal.App.2d 562, 567 [6 Cal.Rptr. 884].) ▇ The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the quali-

---

[11]Miss R and Miss S were also bound at the feet or ankles.

494

fication of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance and then the trial court upon the motion for new trial.[12] (*People* v. *Jackson, supra,* at pp. 567-568.) ▆ The general rule, then, is that it is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony. (*People* v. *Harris,* 87 Cal.App.2d 818, 824 [198 P.2d 60]; *People* v. *Abner,* 209 Cal.App.2d 484, 491 [25 Cal.Rptr. 882]; *People* v. *Cahan,* 141 Cal.App.2d 891, 897 [297 P.2d 715]; see also Witkin, Cal. Evidence, § 171, p. 192.) Our courts have held that it is not necessary that any of the witnesses called to identify the accused should have seen his face. (*People* v. *Loar,* 165 Cal.App.2d 765, 773 [333 P.2d 49].) Identification based on other peculiarities may be reasonably sure. ▆ Consequently, the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing. (*People* v. *Molarius,* 213 Cal.App.2d 10, 15 [28 Cal.Rptr. 541]; *People* v. *Van De Wouwer,* 91 Cal.App.2d 633, 639 [205 P.2d 693]; *People* v. *James,* 218 Cal.App.2d 166, 170 [32 Cal.Rptr. 283]; see *People* v. *Glab,* 15 Cal.App.2d 120, 123 [59 P.2d 195] and *People* v. *Coley,* 61 Cal.App.2d 810, 813-814 [143 P.2d 755].)

▆ Adverting to the record in the light of these principles, we conclude that the following evidence was of sufficient substantiality to warrant a finding by the jury that defendant was the perpetrator of the charged crimes: Miss R testified at the trial that she had identified defendant as her assailant from a lineup at the Hall of Justice in San Francisco on November 25, 1961, and when asked ''do you see him here in the courtroom today?'' answered, ''Yes.'' Upon being asked to point him out she stated ''I can't see very well, but I think that is him.''[13] On cross-examination she testified that at the hospital, shortly after the incident, she was shown several photographs and that she had ''pointed out several pictures that looked something like him but none that

---

[12] In the instant case a motion for a new trial was made by defendant and was denied by the trial court.

[13] The record is silent as to whether Miss R actually pointed to defendant.

looked really like him." When asked if she was shown a picture of Tom Lindsay at the hospital she replied "No, I don't think so," and when questioned as to whether she was sure she had not seen his picture among the photographs, replied, "I may have. I don't know." Miss R testified, further, that at the time when she heard defendant's voice at the lineup she "was quite sure it was him." Officer Fusier testified it was he who received the phone call that a girl at the R residence on Hardwick Road was badly hurt and needed help. He stated that on April 2, 1962, he had occasion to talk to defendant for quite a while and that at that time he felt "that the voice I had talked on the telephone to that evening and that of the defendant, Mr. Lindsay was quite similar." ▊ It is convenient to point out here that testimony relating to the identity of a voice is generally considered competent, its probative value being a question of fact. (*People* v. *Eaton,* 171 Cal.App.2d 120, 123 [339 P.2d 951]; *People* v. *Race,* 151 Cal.App.2d 678, 684 [312 P.2d 322]; *People* v. *Mullins,* 145 Cal.App.2d 667, 670 [303 P.2d 58]; *People* v. *Bennett,* 119 Cal.App.2d 224, 226 [259 P.2d 476]; *People* v. *Sica,* 112 Cal.App.2d 574, 583 [247 P.2d 72].)

▊ Mr. M testified at the trial that he had attended a police lineup in San Francisco on November 25, 1961, and that he had there identified defendant as his assailant on the night in question. When asked if that person was then present in the courtroom he answered in the affirmative and pointed him out. Mr. M stated on cross-examination that on the night of the incident near the "Water Temple" he had viewed the assailant for approximately a minute. Testimony was also adduced that at the grand jury proceeding Mr. M was shown only one photograph, that of defendant, and that he had identified the person there depicted as his assailant "on the night in question." Miss S also testified that she had attended the said lineup on November 25 and that she had there identified defendant by his voice and general appearance. When asked, "Do you see him in Court?" she replied "Yes," and pointed him out.[14] The evidence also showed that when she viewed the person she identified as defendant at the lineup she had stated to a police officer that it seemed to her her assailant's actual features were larger, and particularly that his face and hands were larger.

[14]Although the record is silent as to whether she was pointing to defendant, it is not urged on this appeal that she did not point to him.

Mrs. K testified that on November 18, 1961, she had attended a lineup at the Sheriff's Office in Redwood City; that she had there identified the person who had attacked her, and that she recognized that person in the courtroom. She then pointed defendant out to the court and jury and the identification was noted in the record. Mrs. K further testified that her first impression of the assailant was that he was a high school student. She described the attire the assailant was wearing on the day in question, and described him as over 5 feet 8 inches in height, with dark bushy hair. She also described his voice as soft-spoken, and when asked ''What type of voice does Mr. Lindsay have?'' replied, ''I would say it's soft spoken.'' Miss K did not identify the accused as the assailant because she did not get a clear impression of the attacker.

Miss C, while on the witness stand, was asked if she could make a positive identification of the man who was in her home on December 19, 1960. When asked to look around the courtroom to see if she could she stated, ''I think the man next to the attorney over there.'' When queried, ''That man next to Mr. Woodman on his left?'' she replied, ''Yes.''[15] On cross-examination Miss C was asked, ''In fact, Mr. Lindsay isn't the man, isn't that correct?'' to which she replied ''You are wrong.'' She also testified on cross-examination that at a police lineup in San Francisco she had stated that defendant ''wasn't the man,'' and that at the grand jury hearing, when shown defendant's picture, she had said, '' 'That is not the man.' '' It should be here noted there was also evidence to the effect that a palm print found on a bedroom windowsill in the C home was identified as that of defendant. Regarding palm prints and fingerprints, the general rule is that they are the strongest evidence of identity of a person, and under the circumstances of a case may be alone sufficient to identify a defendant as a criminal. (*People* v. *Atwood,* 223 Cal.App.2d 316, 326 [35 Cal.Rptr. 831] ; *People* v. *Buckowski,* 37 Cal.2d 629, 631-632] [233 P.2d 912] ; *People* v. *Adamson,* 27 Cal.2d 478, 495 [165 P.2d 3] ; *People* v. *Abner, supra,* 209 Cal.App.2d 484, 490; *People* v. *Riser,* 47 Cal.2d 566, 589 [305 P.2d 1] ; *People* v. *Beem,* 192 Cal.App.2d 207, 211 [13 Cal.Rptr. 238].)

The factors emphasized by defendant on the issue of identity, namely, that the victims' description of their assail-

---

[15]Mr. Woodman was defendant's counsel. It is not urged by defendant that he is not the person to whom she was then referring.

ant after the commission of the crime was inconsistent with defendant's physical appearance at trial, and that one of the victims was unable to identify him at the lineup but did identify him at the trial, were all matters going to the weight of the evidence. These factors were argued before the jury and were assessed by them when considering the credibility of the various witnesses. The strength · or weakness of the identification and the discrepancies in this testimony, if there were any, were matters solely for the observation and consideration of the jury in the first instance. Although there may have been some uncertainties, there was no inherent improbability in this testimony. Defendant also raises the ·argument that there may have been suggestions offered by police officers to the witnesses during the lineups. No facts are pointed out in the record which support this claim.

Several material objects were received in evidence which tend to connect defendant with the commission of the offenses with which he was charged. These consist of a screwdriver, two gloves, a pillowcase, an automatic pistol, a cartridge clip, six cartridges, an expended cartridge, and two knives.

 A screwdriver, which was found in a grip in defendant's car, on November 19, 1961, and after his arrest, was admitted in evidence without objection. This tool was apparently introduced to connect defendant with the R crimes. Morris Grodsky, a criminologist, testified that the tool used to force open sliding doors at the R residence was a screwdriver, and that the markings on the door were made by the screwdriver found in defendant's automobile. When defendant testified in his own defense, he explained the presence of marks made on the door by his screwdriver by stating that he had used it in an attempt to enter the R home on an occasion some two or three weeks prior to October 17, 1961.[16] Miss R's father testified that he had occasion to check the doors to his home shortly prior to October 17 because there had been an apparent entry into the home. It was his testimony that at that time there was no evidence of any damage to or tampering with any of the doors to the house, including the subject sliding doors. This conflict in the evidence was for the jury's determination.

[16]Defendant testified that he did not succeed in gaining entrance through this door, but that he was able to enter through another door. He admitted that at that time he took some cuff links or a money clip from the master bedroom of the R home and from $5.00 to $9.00 in paper money from a dresser in the bedroom.

 The gloves and pillowcase were also offered apparently for the purpose of connecting defendant with the R crimes. Their admission was over defendant's objection. The objection to the gloves was upon the ground that Miss R's testimony showed that her assailant was wearing white garden gloves, while the subject gloves were red and white garden gloves, and upon the further ground that there was no showing that the gloves belonged to defendant or that they were used by him. The objection directed to the pillowcase was on the basis that there was no connection between it and defendant. Turning to the evidence in the case we find that Miss R testified that her assailant wore "cotton garden gloves. . . ." She at no time stated that the gloves were "white." The gloves in question were found shortly after the R incident in an area about one mile from the R residence. The pillowcase in question was taken from the R residence. Miss R had testified that the man who assaulted her had placed a pillowcase over her face. The criminologist testified that the pillowcase had a "pattern of blood markings" and that one of the gloves in question had "a pattern of blood stains which are actually a mirror image of the pattern on the pillow case."

The general rule is that exhibits are admissible in evidence upon a prima facie showing of a connection with the crime committed. (*People* v. *Trujillo,* 32 Cal.2d 105, 115 [194 P.2d 681]; *People* v. *Miller,* 177 Cal. 404, 410-411 [170 P. 817].) Each exhibit tends to prove the manner in which the crime was committed. (*People* v. *Peete,* 54 Cal.App. 333, 347-351 [202 P. 51].) " 'As a general rule physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation.' " (*People* v. *Green,* 13 Cal.2d 37, 43 [87 P.2d 821], quoting with approval from *People* v. *Bannon,* 59 Cal.App. 50, 56 [209 P. 1029].) " 'The general tests of the admissibility of evidence in a criminal case are: ... does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense?' " (*People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].)

 Applying these tests to the case at hand, we are satisfied that the gloves and pillowcase were admissible. Under the circumstances of the case the jury was entitled to infer that these exhibits were connected with the commission of the R offenses. The connection of defendant with these offenses depended upon whether his identity as the perpetrator of the crimes was

established; and this, as we have already pointed out, was a determination to be made by the jury.

Defendant contends that it was error to admit into evidence, over his objection, the automatic pistol, the cartridge clip, the six cartridges and the expended cartridge. These were evidently offered to connect defendant with the M-S crimes. At the time of defendant's arrest an automatic pistol loaded with six cartridges was found in the glove compartment of his automobile. One cartridge was in the gun chamber and five were contained in the gun clip. These were the cartridges and gun clip admitted in evidence. On the day following the M-S crimes a police officer found an expended cartridge in the general area where the M-S crimes were committed. Criminologist Grodsky testified that, based upon certain tests he conducted, it was his opinion that this cartridge had been fired from the subject automatic pistol. He also identified the pistol as a ''Colt, caliber 380 automatic pistol'' and the expended cartridge and the cartridges in the pistol as of ''Western manufacture'' and designated for a ''380 automatic caliber.''

The applicable rule is stated in *People* v. *Riser, supra,* 47 Cal.2d 566, 577 : ''When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]'' In the instant case the specific type of weapon used in the crime was not known nor did the prosecution rely on a specific type of weapon. Miss S testified that the gun held by the robber-assailant was ''a black pistol.'' Mr. M. testified that the robber ''had a gun'' and when shown the subject automatic pistol stated: ''It looks somewhat like the gun. I remember that it was black and it was short.'' Since these victims testified that a pistol or gun had been used, the admission of the automatic pistol and the clip and cartridges it contained was not error. (*People* v. *Riser, supra,* at p. 577; *People* v. *Nelson,* 224 Cal.App.2d 238, 255-256 [36 Cal.Rptr. 385] ; *People*

v. *Beltowski*, 71 Cal.App.2d 18, 23 [162 P.2d 59]; *People* v.
*Nichols*, 171 Cal.App.2d 320, 325 [340 P.2d 727].)

 Insofar as the expended cartridge is concerned, it
was not error to admit it in evidence. It was relevant to show
that defendant had at some time been at the scene of the M-S
crimes and that he was familiar with the general area. It was
the prosecution's theory, moreover, as indicated by argument
in chambers, that the expended cartridge was left or dropped
at the scene of the crimes in question. This theory was
urged on the basis that defendant may have been in the habit
of carrying or keeping expended cartridges on his person in
view of testimony that other expended cartridges, although
not of the same caliber, had been found in defendant's
apartment. In view of defendant's subsequent testimony,
while testifying in his own defense, that he "might have been
by it or in that area during the day" and that if he did so,
the gun in question would have been in his possession because
it was in his car, and in view of his further statement that he
had fired the gun in the Pulgas Water Temple area while
demonstrating it to his girl friend five or seven weeks before
his arrest, we fail to see how defendant was prejudiced by
the admission of the expended cartridge. Again, the effect
and value of such evidence, the weight to be given it, and the
resolution of conflicts, if any, were for the jury. Assuming
*arguendo* that it was error to admit the cartridge in evidence,
we cannot say, after an examination of the entire cause, in-
cluding the evidence, that it is reasonably probable that a
result more favorable to defendant would have been reached
in the absence of such error. (*People* v. *Watson*, 46 Cal.2d
818, 836 [299 P.2d 243].)

Two knives were admitted in evidence over defendant's
objection. One of these, described as having a 7-inch blade, was
found in the same grip as the screwdriver aforementioned. The
objection to its admission was on the ground that "the iden-
tification is too general. . . ." The overruling of this objection
was proper. Prior to the court's ruling, this knife, which had
been marked for identification, was shown to Mrs. K while she
was on the witness stand. She testified: "Yes, I would think
the knife was very much like this." Mrs. K had previously
testified that the man who entered her home on the afternoon
of the K occurrence had a knife in his hand.[17] The rule of the

[17]After the knife had been admitted in evidence, and while testify-
ing, Miss K also stated that the man had a knife in his hand when she
first observed him.

*Riser* case which we have applied to the automatic pistol is likewise applicable to this situation. In the application of this rule, testimony that a weapon resembles that used by a participant in a crime is admissible. (See *People* v. *Bird,* 195 Cal.App.2d 606, 609 [16 Cal.Rptr. 3] ; *People* v. *Pianezzi,* 42 Cal.App.2d 265, 269 [108 P.2d 732] ; *People* v. *Nelson supra,* at pp. 255-256.)

██ The other knife, described as a butcher knife, was found by police officers on the floor of the hallway outside Miss R's bedroom when they responded to the call that a girl had been hurt at the R residence. The objection interposed to the admission in evidence of this knife was that there was no connection between it and defendant. The criminologist testified that the length of the blade on the knife was 10 inches long and that he found some blood on the tip of the blade and a small amount on the knife's handle. The officers testified that when they found Miss R she had cuts and lacerations about her shoulders and breasts, and much blood about her body. Miss R testified that her assailant held a knife in his hand when he entered her bedroom. We are satisfied that, in the light of this evidence, the jury was entitled to infer that the subject knife was the one used by Miss R's attacker. While it is true that Miss R testified that the knife held by her assailant looked like a "hunting knife" and that she had so stated to the police, the conflict, if any, was for the jury's determination. Defendant's objection went to the weight of the evidence rather than to its admissibility. It should be here noted that Miss R also stated " . . . I am not sure exactly what hunting knives look like. That was just my impression of it."[18]

Defendant argues that the admission of the butcher knife violated the rule of the *Riser* case because the prosecution had contended that the other knife was the weapon wielded by the assailant. Defendant misconstrues the facts. The knife found in the car was introduced in evidence in relation to the K counts, while the butcher knife was presented in connection with the R counts. There is nothing in the cases to the effect that the prosecution is restricted to presenting only one weapon where, as here, the indictment charges several separate offenses unconnected in their commission.

---

[18]As to each count upon which defendant was found guilty with respect to the R incident the charge of being armed with a deadly weapon was found to be true.

*Was it Error for the Trial Court to Admit Evidence of Other Crimes?*

 *No.* During the trial the prosecution introduced evidence of an uncharged attack committed against Mrs. I in in her home in Walnut Creek on November 2, 1961. Mrs. I testified that she returned home at noon and was alone in the house. She proceeded into the bedroom in order to make the bed. As she started to open the curtains, someone grabbed her from behind and forced her face down on the bed. The man taped her hands together behind her back and gagged her with a handkerchief. He then placed some pillow-cases over her head. These things were done while she was lying face down and he then turned her over and pulled off her girdle, panties and shoes. He then inquired about her money and she told him that there was money in her wallet and also in a pocketbook in the kitchen. When he asked for more, she directed him to her bureau. When he again asked for more, she told him there wasn't any more, and he said " 'If I find any more you will be sorry.' " He left the room and when he returned he forced her to engage in an act of sexual intercourse. Afterwards, he tied her ankles together and roamed through the house for awhile and then left. At the trial the witness identified defendant as her assailant.

It should be here noted that defendant was not charged in the present indictment with the I crimes. It is defendant's claim that the proffered testimony was prejudicial because it tended to draw the attention of the jury away from the evidence dealing with the crimes charged. Defendant also contends that if the evidence was admissible under an exception, then the court erred because it would have strained the exception in allowing the testimony into evidence. It should also be noted here that defendant made no objection to this evidence at the trial. It is the general rule that in the absence of a timely and proper objection in the trial court, alleged error cannot be urged on appeal. (*People* v. *Wein,* 50 Cal.2d 383, 401-402 [326 P.2d 457]; *People* v. *Millum,* 42 Cal.2d 524, 528 [267 P.2d 1039]; *People* v. *Romano,* 197 Cal. App.2d 622, 637 [17 Cal.Rptr. 399]; *People* v. *Alvidrez,* 158 Cal.App.2d 299, 300 [322 P.2d 557].) This rule is based upon the principle that a defendant may not stand mute when an alleged error occurs, gamble on the outcome of the trial, and then, if he loses, raise the issue initially after the jury's verdict has been returned. (*People* v. *Murphy,* 207 Cal.App. 2d 885, 890 [24 Cal.Rptr. 803]; *People* v. *Duncan,* 175 Cal.

App.2d 372, 382-383 [346 P.2d 521].) An execption to the general rule is that the appellate court will consider fundamental errors or gross irregularity where the error is of such a nature and so substantial that an objection would not have obviated it. (*People* v. *Alvidrez, supra,* at p. 301; *People* v. *Simmons* 28 Cal.2d 699, 723 [172 P.2d 18]; *People* v. *Salcido,* 186 Cal.App.2d 684, 689 [9 Cal.Rptr. 57].) This exception assumes in its application that fundamental error was committed by the trial court. This is not the situation in the present case.

▮ The general rule, long enunciated by our courts, is that a defendant can be tried only for the offense charged and evidence of the commission of other offenses is not admissible because its probative value is outweighed by its prejudicial effect. (*People* v. *Westek,* 31 Cal.2d 469, 476 [190 P.2d 9]; *People* v. *Cassandras,* 83 Cal.App.2d 272, 279 [188 P.2d 546]; *People* v. *De Georgio,* 185 Cal.App.2d 413, 418 [8 Cal.Rptr. 295]; 22A C.J.S., Criminal Law, § 682, p. 729; 18 Cal.Jur.2d, Evidence, § 136, p. 583; 1 Wigmore, Evidence (3d ed.) § 193, p. 642.) ▮ This rule prohibits the introduction of evidence of other offenses to show that the accused is a bad person or is inclined toward the commission of crime. (*People* v. *Cook,* 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass,* 158 Cal. 650, 658 [112 P. 281].) The above rule, however, is subject to exceptions grounded upon principles of relevancy. The test of admissibility is: " 'does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (*People* v. *Peete, supra,* 28 Cal.2d 306, 315; *People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974]; *People* v. *Zankich,* 189 Cal.App.2d 54, 62-63 [11 Cal.Rptr. 115].) ▮ In determining whether such evidence is relevant to prove a material fact and not just criminal disposition, the trial court should be guided by the rule that "such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt."

504

(*People* v. *Albertson,* 23 Cal.2d 550, 577 [145 P.2d 7] ; *People* v. *McCaughan, supra,* at p. 421.)

 Since defendant in the instant case denied committing the offenses charged and offered the defense of alibi, he made the issue of identity determinative of the question of his guilt or innocence. In other words, the essential question was whether the prosecution witnesses were mistaken in their identification of defendant as the perpetrator of the crimes with which he was charged. (*People* v. *McCarty,* 164 Cal. App.2d 322, 325 [330 P.2d 484].) In such a situation it is well settled that evidence of other crimes showing a similar *modus operandi* is admissible as tending to identify the defendant as the perpetrator of the charged crimes. (*People* v. *Peete, supra,* 28 Cal.2d 306, 319; *People* v. *Renchie,* 217 Cal.App.2d 560, 563 [31 Cal.Rptr. 694] ; *People* v. *Scott,* 218 Cal.App.2d 249, 253-254 [32 Cal.Rptr. 225] ; *People* v. *Cavanaugh,* 44 Cal.2d 252, 265-266 [282 P.2d 53].) In *Scott* it was remarked : ''Where the identity of the defendant is in issue, evidence that he committed other crimes or attempts under circumstances which were remarkably similar to the one charged may be admitted for the purpose of showing that the defendant did in fact commit the crime charged.'' (Pp. 253-254.) The above quoted rules are applicable to cases involving sexual crimes and it is proper to permit evidence of similar sexual offenses to show a common plan, scheme or design. (*People* v. *Minkowski,* 204 Cal.App.2d 832, 849-851 [23 Cal.Rptr. 92] ; *People* v. *Crisafi,* 187 Cal.App.2d 700, 706-707 [10 Cal.Rptr. 155] ; *People* v. *Malloy,* 199 Cal.App.2d 219, 230-233 [18 Cal.Rptr. 545].)

 The essential question for determination, in each instance, is whether there is either a direct or circumstantial connection between the similar offense and the charged offense to support the inference that if the defendant committed the similar offense, he probably committed the act charged. That determination requires that the facts pertaining to the other offense show a general pattern, scheme, or plan, and that they are sufficiently similar and posses a sufficiently high degree of common features with the act charged to warrant the inference that if the defendant committed the other act or acts, he committed the act charged. Whether the applicable test is satisfied is primarily a question for the trial court. (*People* v. *Grimes,* 113 Cal.App.2d 365, 371 [248 P.2d 130] ; *People* v. *Roach,* 148 Cal.App.2d 364, 368 [306 P.2d 523] ; *People* v. *McCarty, supra,* 164 Cal.App.2d 322, 326.)

Turning to the case at bench, we find that the facts surrounding the commission of the uncharged offense were strikingly similar to the offenses charged. In the I incident, as in the R, S and K crimes, there were present the unlawful gratification of sexual desires and the unlawful obtaining of money. Covering the face of the victim was common, except that in the S case the assailant used a blindfold. In addition Miss R, Miss S and Miss K were tied and each was raped. Therefore, there were enough aspects of the uncharged offense that were similar to the charged offenses to permit the introduction into evidence of testimony bearing upon the uncharged offense and to warrant the inference that if defendant committed the similar uncharged offense, he also committed the acts charged. Of course, there were some factual differences in the various offenses, but for the evidence to be admissible, it was unnecessary to prove that the uncharged offense was identical in every detail with the crimes charged. (*People* v. *Fowler,* 119 Cal.App.2d 657, 662 [260 P.2d 89] ; *People* v. *MacEwing,* 216 Cal.App.2d 33, 48-49 [30 Cal.Rptr. 476].) Under the circumstances, therefore, it cannot be said that the trial court abused its discretion in determining that the probative value of the I incident, presenting, as it did, evidence of a similar *modus operandi,* outweighed its prejudicial effect. Moreover, the trial court properly instructed the jury as to the limited purpose for which such evidence was received substantially in the form of CALJIC Instruction No. 33.[19]

*Was There Error in the Manner in Which the Jury's View of the Scene Was Conducted?*

No. It is defendant's contention that his constitutional rights were violated by the manner in which the jury's view of the R premises was conducted. He asserts that

---

[19]The instruction, CALJIC No. 33 with adaptations, is as follows:

''Evidence was offered in this case for the purpose of showing that the defendant committed crimes other than those of which he is accused and for which he is on trial in this action; namely, that he committed burglary of the inhabited dwelling of . . . [Miss I] in Walnut Creek, California, that he committed rape upon the person of ... [Miss I], and that he committed the crime of robbery from the person and presence of ... [Miss I].

''Such evidence was received for a limited purpose only; not to prove distinct offenses or continual criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent or guilty of the crimes charged against him in this action.

''You are not permitted to consider that evidence for any other

his constitutional right to be confronted with the witnesses against him was denied because he was separated from the jury while they were on the R premises.

The facts giving rise to this objection are as follows: Defendant requested that the jury be afforded a view of the R premises. At the R residence, defendant was some 100 yards away, outside the house and in a sheriff's car with three law enforcement officers. At this time the jury was inside the R house where Miss R made a momentary appearance but the record reflects that there was no contact nor mingling between the jurors and Miss R. It is this separation which is the basis of defendant's claim of error. The record does not indicate that defendant or his counsel made any objection to the manner in which the view was conducted either at the time or after the return to the courtroom.[20] It also appears from the record that defendant's counsel was aware of this possible objection at the time he stipulated that defendant was present at the view.[21] However, defendant did not object

---

purpose, and as to that purpose you must weigh such evidence as you do all other in the case.

''The value, if any, of such evidence depends on whether or not it tends to show—

''[1] the identity of the person who committed the alleged crimes in question in this case, if they were committed; or

''[2] that the defendant entertained the intent which is a necessary element of the alleged crimes for which he is now on trial; or

''[3] that there existed in the mind of the defendant a plan, scheme, system or design, into which fitted the commission of the offenses for which he now is on trial.''

[20]The following testimony is indicative of the attitude of defendant: ''THE COURT: All right. The record will show that we have all our jurors here in their respective places and defendant and counsel are present, and we have just returned from a view of the ... [R] premises. And may it be stipulated, Counsel and the defendant, that Counsel for both sides and the defendant himself was [sic] present at all times during the tour? MR. WOODMAN: Well, I would stipulate the defendant was generally present, Your Honor, yes. THE COURT: All right. MR. CAREY: We so stipulate, Your Honor, that the defendant was out on Hardwick Road, in the vicinity of . . . Hardwick, while the jury walked around, took a look at the area. THE COURT: Is that a fair stipulation? MR. WOODMAN: That is a fair stipulation. We will so stipulate. THE COURT: I wanted the record to be clear on it.''

[21]Counsel's following statement evidences his awareness of this objection: ''Now, the Court asked for stipulation that during the course of trial, if Your Honor will recall, and the record will properly show, that we qualified our stipulation that he was about but at no time stipulated that he was on the premises when the jury was on the premises,

to this irregularity at the trial nor did he urge it as a ground on a motion for new trial.[22] What we have hereinbefore said concerning the failure to object in the trial court is likewise applicable to this situation. Appellate courts have frequently found a waiver either by a failure to object or by concurrence in the procedures followed. (*People* v. *Pompa,* 192 Cal. 412, 421-423 [221 P. 198] ; *People* v. *Fitzgerald,* 137 Cal. 546, 547-551 [70 P. 554] ; *People* v. *Tarm Poi,* 86 Cal. 225, 229-231 [24 P. 998] ; *People* v. *Fitzpatrick,* 80 Cal. 538, 539-541 [22 P. 215].) Such a waiver may even extend to the right to be present at all at the view of the premises. (*People* v. *Mathews,* 139 Cal. 527, 528-530 [73 P. 416] ; *People* v. *Searle,* 33 Cal.App. 228, 232 [164 P. 819] ; *People* v. *White,* 20 Cal.App. 156, 157-160 [128 P. 417] ; see also *People* v. *Aronow,* 130 Cal.App.2d Supp. 898, 899 [279 P.2d 840].)

■ Moreover, there is no due process requirement that a defendant be present at a view of the premises by the jury. (*Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575].) ■ Accordingly, we are satisfied that, under the circumstances of the instant case, the irregularity, if any, was waived by defendant.

■ Assuming, however, that implicit in the remarks of defendant's counsel there is an objection to the procedure, we perceive no error. The record shows that the jury was informed as to the proper deportment expected of it by the law when viewing the scene. The record also showed that the court, counsel, defendant, and jury retired to the R premises and returned therefrom. As to the contention that Miss R mingled with the jurors in the house while defendant was outside, the court's remarks show that at the most the jury caught a brief glimpse of Miss R but that there was no contact or mingling between Miss R and the jury. As to defendant's separation from the jury, it is evident that defendant was about the R premises but not in the immediate presence of the jury in the house. He had a view of the premises and could observe the activities of the jury to a substantial degree. We cannot say, therefore, under the circumstances,

and at no time had we stipulated that he was in the premises when the jury was in the premises. I think the record should be quite clear on that particular point.''

[22]Pen. Code § 1181, applicable to the grounds for a new trial, provides, in pertinent part, as follows: ''[T]he court may ... grant a new trial, in the following cases only: 1. When the trial has been had in his absence except in cases where the trial may lawfully proceed in his absence; ...''

and in the absence of any showing of prejudice, that this brief separation requires a reversal. Assuming error, we cannot say, moreover, after an examination of the entire cause, including the evidence, that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of such error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

*Was There Error in the Court's Instructions Relating to the Charge of Kidnaping for the Purpose of Robbery?*

 *Yes.* Defendant's contention in this regard is that the evidence fails to show that he had a specific intent to commit robbery under the counts which charged him with kidnaping for the purpose of robbery. (Pen. Code, § 209.) Defendant further claims that the assailant's whole effort was devoted to gratifying his sexual desires, and that the robbery was merely an afterthought.

The court gave abundant instructions to the jury concerning the intent requirement for this kind of crime. In its instructions the court included the following: "You are instructed that it is unnecessary to determine whether the kidnaper intended to commit robbery at the time of the original seizure and carrying away. It is sufficient if you find that a robbery was committed during the course of the abduction. Thus, whatever may have been the original motive of the kidnaping, if the kidnaper commits robbery during the kidnaping he 'carries away' his victim 'to commit robbery' within the meaning of Section 209 of the Penal Code. . . ." This instruction was apparently given under the authority of *People* v. *Brown,* 29 Cal.2d 555 [176 P.2d 929], and *People* v. *Knowles,* 35 Cal.2d 175 [217 P.2d 1]. In *Knowles* the Supreme Count stated that there is no condition that robbery be premeditated as a part of a kidnaping for the purpose of robbery, and in *Brown* the court affirmed the death penalty on the ground that the taking of the victim's purse, wristwatch and automobile made the abduction kidnaping to commit robbery, even if the original objective was rape and the intent to rob was only an afterthought.

An instruction similar to one in the instant case was held to have been so prejudicial as to require a reversal in the recent case of *People* v. *Smith,* 223 Cal.App.2d 225, 233-234 [35 Cal.Rptr. 719].)[23] The only perceptible difference between the

[23]Petition for a hearing was denied by the Supreme Court on February 5, 1964.

instruction given in the *Smith* case and that in the present case is the use by the former of the word "immaterial" instead of the word "unnecessary."[24] It is specifically noted in *Smith* that *Brown* and *Knowles* were both decided prior to the 1951 amendment to Penal Code section 209 which changed the law with respect to kidnaping for the purpose of robbery. The court, in *Smith,* observed that the 1951 amendment to section 209 "requires an asportation for the crime of 'kidnaping for the purpose of robbery,'" and that "[p]rior to the 1951 amendment, mere *holding* or *detaining* an individual for purposes of robbery constituted kidnaping for the purposes of robbery." (Pp. 233, 234.) The conclusion reached by the reviewing court in *Smith* is stated by Presiding Justice Burke as follows: "Accordingly, an additional effect of the change in the statute is to make it necessary for the trier of fact to determine whether the kidnaper intended to commit robbery at the time of the original seizing. In this respect the crime is similar to burglary where it is necessary to show that the entry was with the intent to commit larceny or any felony. An illegal entry but without such an intent is not a burglary (*People* v. *Jenkins,* 16 Cal. 431) ; similarly since the 1951 amendment to section 209, kidnaping without intent to rob constitutes kidnaping but not kidnaping for purpose of robbery; and a robbery during a kidnaping where the intent was formed after the asportation is a robbery and not a kidnaping for purpose of robbery." (P. 234.)

We agree with the interpretation placed by *Smith* upon section 209. ▉▉▉ We are satisfied that when the Legislature, in 1951, inserted the words "or any person who kidnaps or carries away any individual *to* commit robbery" (italics added) in said section, it was the legislative intent that robbery be premeditated as part of the kidnaping. The phrase "to commit robbery" obviously means with the intent or purpose of committing a robbery. We are therefore persuaded that the holding of the *Smith* case applies in the case at bench. ▉▉▉ The instruction in the instant case clearly told the jury that even if the intent to rob was formed *after* the asportation the crime of kidnaping for the

---

[24]The instruction in *Smith* read as follows: "'It is immaterial whether the kidnaper intended to commit robbery at the time of the original seizure or carrying away. It is sufficient if the robbery was committed during the course of the abduction.'" (P. 233.)

purpose of robbery was nevertheless committed. We accordingly deem the error to have been prejudicial and to require a reversal of Counts 8 and 10 of the indictment.

### The Motion to Strike Defendant's Interrogatories.

Defendant claims that the trial court committed error when it granted the motion of the People to strike all written interrogatories proposed by defendant. The proposed interrogatories have not been made a part of the record on appeal. We therefore have no way of knowing their nature and purport.[25] ■ It is an appellant's duty to point out error and to perfect his record on appeal. (*Kyne* v. *Eustice,* 215 Cal.App.2d 627, 634-635 [30 Cal.Rptr. 319]; *Estate of Hoffman,* 213 Cal.App.2d 635, 639 [29 Cal.Rptr. 60].) ■ Moreover, it is well established in this state that an appellate court will not consider assignments of error based upon asserted matters not shown by the record and supported by nothing more than statements in an appellant's brief. (*People* v. *Barnhill,* 185 Cal.App.2d 645, 652 [8 Cal.Rptr. 548]; *People* v. *Boyden,* 181 Cal.App.2d 48, 55 [4 Cal.Rptr. 869]; *People* v. *Hernandez,* 150 Cal.App.2d 398, 402 [309 P.2d 969]; *People* v. *Villarico,* 140 Cal.App.2d 233, 236 [295 P.2d 76].) All that the record shows in the instant case is that the trial court granted the People's motion to strike defendant's interrogatories, and nothing more. ■ The broad discovery provisions of the Code of Civil Procedure are limited to civil cases and have no applicability to criminal cases. (*Clark* v. *Superior Court,* 190 Cal.App.2d 739, 742 [12 Cal. Rptr. 191].) ■ In criminal cases, the Legislature permits the taking of depositions and interrogatories in the following situations: nonresident witness to be examined (Pen. Code, § 1349); witness about to leave the state or who is sick or infirm (Pen. Code, § 1336); and conditional examination of witness (Pen. Code, § 1335). In addition liberal discovery rules have been invoked in California by the decisions. ■ Thus in a proper case, one charged with a crime may, before trial, inspect: statements of his own in possession of the prosecutor, whether signed, unsigned, or on recording tapes; real evidence or reports of state officers' examination thereof; statements of persons expected to be prosecution witnesses at trial; and names and addresses of eyewitnesses

---

[25]The contention made in defendant's brief is that "The intent of the proposed interrogatories was to discover from the adverse party the existence of prospective witnesses and facts so that Pre-trial discovery could have been facilitated and depositions taken."

of an alleged crime. (See decisions reviewed in *People* v. *Cooper,* 53 Cal.2d 755, 769-770 [3 Cal.Rptr. 148, 349 P.2d 964] ; *Jones* v. *Superior Court,* 58 Cal.2d 56, 58-60 [22 Cal. Rptr. 879, 372 P.2d 919] ; *Yannacone* v. *Municipal Court,* 222 Cal.App.2d 72, 74 [34 Cal.Rptr. 838].) But a defendant has to show some better cause for inspection than a mere desire for the information which has been obtained by the People in their investigation. (*People* v. *Cooper, supra,* at p. 770.) Pretrial discovery in favor of a defendant is not required by due process. (*Jones* v. *Superior Court, supra,* at p. 59.) In the present case there is nothing in the record to show that the request should have been granted in the interest of a fair trial, nor does defendant show how the denial of the subject motion was erroneous or prejudicial. There is no showing, moreover, that anything developed at the trial to indicate that the court's striking of the interrogatories harmed defendant.

The judgment of conviction is affirmed as to all counts, excepting Counts 8 and 10 and reversed as to Counts 8 and 10.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied June 16, 1964, and respondent's petition for a hearing by the Supreme Court was denied July 22, 1964. Peters, J., was of the opinion that the petition should be granted.