Filed 9/18/14  P. v. Trott CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B252429 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA100824) |
| v. | |
| REBECCA ANN TROTT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Libby A. Ryan, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Rebecca Ann Trott, appeals from the judgment entered following a jury trial which resulted in her conviction of second degree commercial burglary (Pen. Code, § 459),[1] forgery (§ 484f, subd. (a)), and two counts of identity theft (§ 530.5, subd. (a)). The trial court sentenced Trott to three years eight months in county jail. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

1. *Facts*.

On September 26, 2013, Michael Lopez had been the security manager at the Diamond Bar Target Store for approximately one year and three months. As part of his duties, Lopez "overs[aw] . . . shortage[s] within the [store,] . . . includ[ing] external theft, internal theft, and shortage[s] through process." With regard to "external theft," Lopez investigated matters where "guests" came into the store and decided to steal merchandise. For example, he determined whether "they enter[ed] the store with or without the merchandise" and whether "upon exiting the store, [they] pass[ed] all manned registers without paying, then [left] the store." In addition to theft and "shortage" problems, Lopez investigated such things as "check fraud" and "credit card fraud."

To assist Lopez in his work, there are security cameras located throughout the interior of the store and in the parking areas. In addition, he has access to various reports as well as receipts from every transaction which has been conducted in the store. From the reports and receipts, Lopez can tell the time, date and merchandise which has been purchased along with the dollar amount and payment method used. The system can also "synchronize the receipt [with] a matching video." Using this equipment, Lopez can view "real time transaction[s]" and "review past transactions."

Lopez was working at the Diamond Bar Target Store on October 10, 2012. On that day, he received a telephone call from a credit union indicating there had been "fraudulent activity" on several accounts. By using the account information given to him, Lopez was able to "review the transactions [which had taken] place on those [credit

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

2

card] accounts and print out copies of [the] receipts, video and . . . exit still shots." The credit union had given to Lopez between two and four account numbers and, when he put one account number into the system he discovered that someone had attempted to purchase "DVD's and a few other electronic items . . . with two separate credit cards under two different names." The purchases would have amounted to $158.76. The credit cards, which bore the names Shannon Dalton and Jaret Acton, had both been declined. However, when the individual attempted to buy the merchandise with a third credit card, bearing the name James Yang, the charge was approved.

A video of the transaction showed a woman attempting to make the purchases. When the first two cards were declined, she left the store only to return approximately 10 minutes later. She succeeded in purchasing the merchandise with a third card. The video then showed the woman leave the store, but remain in the parking lot. After viewing all the footage from various video cameras, Lopez, assisted by a deputy sheriff, created an edited version of the transaction. That video, which consisted of shots of the suspect's "entrance, transactions, and exit," in addition to things Lopez "felt would be valuable" should the matter go to court, was shown to the jury.

The video begins in the parking lot and shows a man and a woman getting out of a white car. As the two then approach the Target store, they split up. The woman, who is wearing a pink shirt and dark pants enters the main portion of the store and is next seen attempting to purchase DVD's and electronic items with two different credit cards. Both cards were apparently rejected. After leaving the store for a short time, the woman in the pink shirt is shown returning to the cash register and, by using a third credit card, purchasing the merchandise. She is then shown leaving the store. A later portion of the video shows the white car pulling out of the parking lot.

Lopez indicated the actions of the woman in the pink shirt and dark pants, as seen on the video, were "consistent with what [he had seen] on the transaction receipt[s]" and the "information [he had] received from the credit union." Based on his training and experience, Lopez concluded the woman in the pink shirt was "the person [who] used [the] credit cards in [the fraudulent] transactions."

3

Los Angeles County Sheriff's Department Detective Derick Wayne Coleman was assigned to investigate the "identity theft incident" which occurred at the Diamond Bar Target Store. After reviewing the initial report, the detective collected and reviewed all the evidence, including the video. Coleman also reviewed a report, video tape and photographs which had been sent to him by a detective investigating a similar identity theft incident which had occurred at the Target store in Upland on the same day. The incident in Diamond Bar had taken place at approximately 12:25 p.m. and the incident at the Upland store had taken place at approximately 2:55 p.m.

When Detective Coleman compared two surveillance photographs he had received from the detective at the Upland store with a still photograph "queued up" and paused from the video taken at the cash register at the Diamond Bar Target Store, he concluded they were pictures of the same person. The detective from Upland then sent to Coleman the name of the individual pictured in the photographs and Coleman "r[a]n" a photograph through Department of Motor Vehicles (DMV) records. Coleman received from the DMV a document with a photograph and the name of an individual. When Coleman compared the DMV photograph with those from the Upland and Diamond Bar Target stores, he determined they were all of the defendant, Rebecca Ann Trott.

Coleman contacted four persons whose identities had allegedly been compromised. He initially spoke with Jaret Acton and James Yang to determine whether either man had given Trott, or anyone else, permission to use his credit card number to make a purchase at the Diamond Bar Target Store.

Jaret Acton lives in Fresno and in October 2012 was a member of the Educational Employees Credit Union. Acton had several accounts at the credit union, as well as a credit union VISA credit and debit card. In October 2012, Acton was contacted by the credit union and informed "that someone was trying to use [his] card" at the Target store in Diamond Bar. Acton, who had never been to Diamond Bar, told the credit union representative he had not authorized use of the card and the credit union "stopped those charges." When Acton was contacted about the fraudulent charges being made on his

credit card, the card was in his possession. The credit union, accordingly, cancelled that card and sent him a new one.

Acton had never heard of anyone by the name of Rebecca Trott until the Sheriff's Department informed him that she had attempted to use his credit card. At trial, Acton indicated he had never seen Trott before and that she had not had permission to use his account information.

James Yang also lives in Fresno and has an account at the Education Employees Credit Union. On October 10, 2012, while he had his VISA debit card in his possession, he was "made aware of fraudulent charges [being made] on [his] account" for purchases at the Diamond Bar Target Store. Yang, who had also never been to Diamond Bar, had not authorized any purchases made from the Target store there. Yang was also not familiar with and had never seen a woman named Rebecca Trott and had not given Trott permission to use his credit card information.

Kristi Mackechnie is a "risk analyst" at the Educational Employees Credit Union in Fresno. Although the credit union has several branches in the central valley of California, they have no branches in Southern California. As a risk analyst, Mackechnie "monitor[s] debit . . . and credit card proprietary activity" and looks for "anomalistic card behavior activity." In particular, she looks for "[a]nything outside the normal spending pattern or spending geographic location." For example, most of the 225,000 account holders do not use their cards in Southern California. When an "anomalistic . . . transaction pattern" occurs, Mackechnie contacts the account holder to determine if use of the account or accompanying cards is legitimate.

On October 10, 2012, numerous transactions occurred at Target stores which "raised a red flag." The transactions were occurring "very quickly" in Southern California, an area outside most credit union customers' "normal spending . . . area." The spending pattern was affecting approximately 20 credit union accounts and since Mackechnie could see, through the credit union's computer system, the transactions as they were occurring, she believed the person making the transactions was still in the vicinity and she contacted "local authorities" as well as the loss prevention department at

the credit union. Mackechnie hoped the individuals making the transactions could be located and stopped. For example, a fraudulent transaction at the Diamond Bar Target Store for $160.90 attempted by use of the account of a customer named Jaret Acton had been "declined."

Christopher Hilliard had been a police officer for the City of Upland for 12 years. At approximately 2:55 p.m. on October 10, 2012, the officer, who was on patrol, was called to 1931 North Campus Avenue with regard to "a forgery in progress." There were two suspects, the first of which was described as "a White female adult, 20 to 30 years [old], five foot eight, 200 pounds, wearing a bright pink T-shirt, black pants, and white shoes." Hilliard drove into the parking lot, near the front entrance. After he was informed by radio the suspect was walking out the front door of the store, the officer saw a woman who fit her description. He got out of his patrol car, approached the woman and, after explaining to her it was with regard to a reported theft, detained her. After a security guard identified the suspect as Trott and the officer reviewed surveillance video and records of transactions, Hilliard took Trott into custody. A search of Trott revealed four credit or bank cards in her left rear pocket and three bank cards in her right rear pocket. Although Trott was carrying no identification, she gave to the officer her correct name, date of birth and driver's license number.

At the police station, each of the cards found in Trott's possession was run through a "card reader." From the magnetic strip on the back of the credit or debit card, the machine indicated the name assigned to the card. Further investigation indicated six of the seven cards belonged to individuals with accounts at the Educational Employees Credit Union. The seventh card was a Target gift card.

2. *Procedural history.*

Following a preliminary hearing, on July 29, 2013, an information was filed charging Trott with one count of second degree commercial burglary, a felony (§ 459) (count 1); one count of forgery, a felony (§ 484f, subd. (a)) (count 2); and three counts of identity theft, all felonies (§ 530.5, subd. (a)) (counts 6, 7 and 8). Trott entered pleas of

6

not guilty to each of the charges and rejected the People's offer of two years in county jail.

At proceedings held on September 25, 2013, the People's motion to dismiss count 6, the identity theft of Shannon Lea Dalton, was granted. Then, pursuant to the agreement of all the parties, "count 7 of the information [was] deemed count 3 and count 8 of the information [was] deemed count 4."

A hearing was held with regard to whether the prosecution could present evidence that Trott's use of the allegedly fraudulently obtained credit information at the Diamond Bar and Upland Target stores was linked to the use of such information at stores in Montclair and La Verne. In addition to Trott's participation in offenses at those two stores, there was evidence she had been accompanied by or was working with a codefendant or "co-perpetrator" at other stores. The trial court determined the circumstantial evidence was relevant and admissible to show that an individual "acting in the company of Miss Trott" indicated there existed a "well thought out plan to hit all these stores within minutes of one another and go on this little shopping crime spree." The court continued: "It's very probative. It lays out, quite frankly, a very detailed conspiracy and common plan, scheme and design to hit these stores as quickly as possible using the same unauthorized accounts from the same credit union. . . . The jury will be permitted to hear it for those reasons." The jury would not, however, be permitted to hear "of a conviction" of a co-perpetrator.

After argument was heard on the matter, the trial court allowed the People to present as an exhibit a "spread sheet" which showed not only the account numbers which Mackenchnie and her assistant had tracked, but also referred to the names of the credit union's customers. The trial court commented: "I think it's all part of the general course and scope of the business of the credit union to track whose account belongs to whom." The trial court, however, sustained defense counsel's objection to the admission of personal notes added to the spreadsheet and ordered that they be redacted. The trial court made virtually the same ruling with regard to a document retrieved by one of the investigating police officers. The portion of a document found in Trott's possession

which showed credit card numbers and account information provided by a computer system referred to as a "reader system" was admissible. Information added by the officer, such as the type of credit card used, was not.

After City of Upland Police Officer Christopher Hilliard completed his testimony, Trott made a *Marsden*[2] motion. Trott indicated she believed her counsel was failing to adequately represent her because counsel had refused to attempt to have admitted into evidence a police report which included a description of the individual who had committed the alleged crimes. The officer had not observed the transactions, he had simply written in his report what one witness had told him he or she had observed. The trial court responded: "Well, a police officer simply cannot testify as to a description that someone else gave him or her when a report was made. That's hearsay. That is inadmissible testimony." The person who had actually viewed the transaction could have testified with regard to the description of the perpetrator, but Trott did not know the identity of the individual.

During the same motion, Trott indicated she also had a problem with the Upland police officer who testified he could identify her from the video "when the pictures [were] very blurry and [one could not ] even see a face." After noting the officer had identified Trott, not from viewing her facial features but from her clothing, the trial court denied Trott's motion.

Before the last prosecution witness testified, defense counsel objected to the admission of several of the People's exhibits. With regard to the authenticity of two photographs purportedly taken from the photo surveillance camera in the interior of the Upland Target Store, the prosecutor indicated a detective had testified he had received the photographs from an Upland detective and the "time stamp on [them] corresponded with the time stamp he knew those crimes had occurred in Upland . . . ." As to two additional receipts from the Upland Target Store, the prosecutor stated he had received them from that particular store and the transactions and times corresponded to the surveillance

_____

**2**      *People v. Marsden* (1970) 2 Cal.3d 118.

8

video.  In addition, the spreadsheet from the Upland store "pinpointed the Upland transactions which mirrored the information on [the] receipts."  Based on the prosecutor's assertions, the trial court allowed the exhibits to be received into evidence.

After all the evidence had been presented, defense counsel made a motion to dismiss the matter pursuant to section 1118.1.  Counsel argued the evidence of the alleged crimes was insufficient.  Counsel stated:  "We do not feel that the People have proven their case, that Miss Trott ha[s] committed any of these four charges and that she intended to commit the crimes . . . ."  The trial court denied the motion, indicating it was a case "the jury [was] entitled to hear and consider."  The court believed "there [was] enough evidence in the record [for] a jury [to] reach a verdict beyond a reasonable doubt."

On the morning of September 30, 2013, the trial court gave to the jury its final instructions and the jury heard counsel's closing arguments.  It then began to deliberate.  That afternoon, the jury's foreperson, Juror No. 4, informed the trial court the jury had reached verdicts in the matter.  After the trial court inspected the documents, the court clerk read the verdicts.  With regard to count 1, the jury found Trott "guilty of the crime of burglary in violation of . . . section 459, a felony, who did enter a commercial building occupied by Target on or about October 10, 2012, with the intent to commit theft . . . ."  As to count 2, the jury found Trott "guilty of the crime of forgery, in violation of . . . section 484f, sub[division] (a), a felony, committed on or about October 10, 2012 . . . ."  As to counts 3 and 4, the jury found Trott "guilty of the crime of identity theft, in violation of . . . section 530.5, sub[division] (a), a felony, who did willfully and unlawfully obtain personal identifying information of Jaret Acton as charged in count 3 [and James Yang as charged in count 4] of the information."  The trial court polled the jury and each juror indicated he or she had reached those verdicts.

Trott was sentenced on October 16, 2013.  The trial court indicated this case was "just a matter of determining whether or not this is a probationary sentence or a state-prison commitment.  If it is a state-prison commitment, it will have to be served in the county jail."  The court then commented the People had been "very generous in their

9

filing of the complaint and subsequent information." The court continued: "Miss Trott very easily could have been prosecuted for multiple counts. Quite frankly, I think the evidence showed up to 26 separate counts of identity theft based upon the evidence that I heard during this trial under a conspiracy theory of liability, even though she may not have been the perpetrator of all those thefts. . . . I cannot ignore the fact that this was a very sophisticated operation, [of] which Miss Trott was a major participant." On the other hand, the trial court acknowledged "on Miss Trott's behalf [that] she ha[d] very little to no criminal history. . . . [The court] call[ed] it [an] insignificant criminal history." However, the trial court determined when it "weigh[ed] that mitigating factor against the aggravating factors, [it was] crystal clear this [was] a high-term case."

The trial court denied probation and imposed as the base term the upper term of three years in prison for Trott's conviction of count 7, later deemed count 3, for identity theft in violation of section 530.5, subdivision (a). The court then imposed one-third of the midterm of two years, or eight months, for count 8, later deemed count 4, identity theft of a separate victim, also a violation of section 530.5, subdivision (a), the term to run consecutive to that imposed for count 3. Subordinate to those two counts, the trial court imposed the upper term of three years for Trott's conviction of count 1, second degree commercial burglary. The court then stayed the sentence "pursuant to . . . section 654 [in] that [Trott] carried out the requisite intent required when she made the . . . fraudulent purchases." With regard to count 2, Trott's conviction of forgery in violation of section 484f, subdivision (a), the court imposed the upper term of three years, then stayed the sentence pursuant to section 654. In total, the trial court sentenced Trott to three years eight months in prison, the term to be served in county jail pursuant to section 1170, subdivision (h)(1) and (2).

The trial court awarded Trott presentence custody credit for 111 days actually served and 111 days of conduct credit, for a total of 222 days. With regard to fines and fees, the court ordered Trott to pay a $240 restitution fine (§ 1202.4, subd. (b)), a $160 court operations assessment fee (§ 1465.8, subd. (a)(1)), a $120 criminal conviction assessment (Gov. Code, § 70373) and a $10 crime prevention fund fine (§ 1202.5).

10

Although the trial court ordered Trott to pay restitution to the victims pursuant to section 1202.4, subdivision (f), it indicated it would reserve jurisdiction over the matter until the amount of the claims could be determined.

Trott filed a timely notice of appeal on October 16, 2013.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.  By notice filed June 6, 2014, the clerk of this court advised Trott to submit within 30 days any contentions, grounds of appeal or arguments she wished this court to consider.  In a letter filed July 2, 2014, Trott requested an extension of 30 days within which to file such a brief and on July 8, 2014, this court granted her request to file a supplemental brief  on or before August 6, 2014.

In a supplemental letter brief filed August 6, 2014, Trott first asserted she was wrongfully convicted of offenses which occurred at the Diamond Bar Target Store based entirely on inadequate circumstantial evidence.  She indicated the only evidence linking her to that store was that she had been wearing a pink shirt and that the credit and debit cards used to make the fraudulent purchases were from the same financial institution as those used to make fraudulent purchases at the Upland store.

When determining whether the evidence was sufficient to sustain an appellant's convictions, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  "[T]he test of whether evidence is sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [the defendant guilty] beyond a reasonable doubt.' [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 667, italics in original.)  "We draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.)  Reversal is not warranted unless it appears that " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the fact the appellant committed the offenses].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

11

Here, Trott fails to recognize that a video made at the Diamond Bar store shows her, wearing a bright pink shirt and dark pants, get out of a car, enter the Diamond Bar store, attempt to make purchases with two cards which were rejected, successfully make a purchase with a third fraudulently obtained card, then leave the store and drive off with a companion. In addition, the security guard on duty at the time indicated the actions of the woman in the pink shirt and dark pants, later identified as Trott, were consistent with what he had seen on the transaction receipts and the information he had received from the credit union from which the cards had been fraudulently duplicated.

In addition, there is evidence Los Angeles County Sheriff's Detective Derick Wayne Coleman, who was assigned to investigate the Diamond Bar Target Store incident, reviewed the security guard's report and the Diamond Bar store video as well as information sent to him by a detective investigating a similar incident at the Upland Target Store. When Coleman compared two surveillance photographs he had received from the detective at the Upland store with a still photograph "queued up" and paused from the video taken at the cash register at the Diamond Bar store, he concluded they depicted the same person. Although Trott indicates her face is not identifiable on the video tape, it was apparently clear enough for Coleman to believe it portrayed the same individual as that shown in the photographs sent from Upland. In addition, the clothing being worn by the woman in the video was the same as that being worn by the woman in the pictures from Upland. The photographs were so similar Coleman "r[a]n" one of them through the Department of Motor Vehicles records. In response, he received a document with a photograph of Trott. This evidence, alone, would be sufficient to support the jury's finding Trott was the individual involved in the fraudulent credit card transactions at the Diamond Bar Target Store. However, additional evidence was presented which bolsters the testimony of both the Diamond Bar security officer and Detective Coleman.

In her brief, Trott indicates she was described as "Hispanic." Initially, our review of the record fails to reveal any instance during which Trott was referred to as such. Moreover, when Upland Police Officer Christopher Hilliard responded to a call directing him to the Upland store, the individual attempting to make purchases with fraudulent

12

credit cards was described as "a White female adult, 20 to 30 years [old], five foot eight, 200 pounds, wearing a bright pink T-shirt, black pants and white shoes." When Hilliard saw a woman matching that description and later took her into custody, she identified herself as Rebecca Trott. A search of Trott then revealed seven fraudulent bank cards drawn on the same credit union as those used at the Diamond Bar store.

On the record presented, more than sufficient, substantial evidence supports the jury's finding Trott was the individual who attempted to, and did, use fraudulently obtained credit and debit cards to make purchases at the Diamond Bar Target Store. (See *People v. Lindsay* (1964) 227 Cal.App.2d 482, 493-494 ["The strength or weakness of the identification . . . go[es] to the weight of the evidence and the credibility of the witnesses, and [is] . . . directed solely to the attention of the jury . . ."].)

Trott also contends her trial counsel was ineffective. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) If the defendant makes an insufficient showing with regard to either component, the claim must fail. (*People v. Holt, supra,* 15 Cal.4th at p. 703.)

Trott first indicates her counsel should have called to testify the cashier who assisted the individual who attempted to purchase merchandise with fraudulent credit and debit cards. Trott simply asserts, "[t]he only person who had face-to-face contact with the suspect was the cashier." Trott indicates her counsel could not argue the cashier was "anonymous" as he or she must have appeared on the video and his or her number must have been on the receipts admitted into evidence. Trott, however, committed the offenses on October 10, 2012. It is possible that, at the time of trial, September 2013, the cashier no longer worked at the Target store and could not be found. Moreover, although Trott infers the cashier would have testified the person who attempted to and made the fraudulent transactions was not Trott, it is possible the cashier, if found and called to

testify, might have indicated otherwise. Trott, who apparently had no contact with the cashier after the incident, cannot assert with certainty the cashier's testimony would have exonerated her. Under these circumstances, it cannot be concluded Trott's counsel acted unreasonably by failing to seek out and call the cashier as a witness.

The same is true with regard to Trott's assertion her counsel should have requested a lineup. Initially, it is unclear who Trott would have had view the lineup and, more importantly, whether those individuals would have indicated Trott resembled the woman who used the fraudulently obtained cards to attempt to and make a purchase at the Diamond Bar Target Store.

Trott further asserts her trial counsel was ineffective in that she failed to file a motion to have the offenses "dropped to . . . misdemeanor[s]." Section 17, subdivision (a) provides: "A felony is a crime that is punishable with death, by imprisonment in the state prison, or . . . imprisonment in a county jail under the provisions of subdivision (h) of Section 1170." Here, Trott was charged with and found guilty by a jury of felonies: second degree burglary in violation of section 459; forgery in violation of section 484f, subdivision (a); and two counts of identity theft in violation of section 530.5, subdivision (a). A review of the trial transcript indicates that, at sentencing, defense counsel addressed the trial court and stated: "Your Honor, to get a clarification[,] my client has a belief she got convicted of second degree as a misdemeanor." The trial court responded: "They are all felonies, Miss Trott." The trial court continued: "Here's the way I look at it. I've certainly listened to the evidence. I know [the] People were very generous in their filing of the complaint and subsequent information. Miss Trott very easily could have been prosecuted for multiple counts. . . . [T]his was a very sophisticated operation, [of] which Miss Trott was a major participant. . . . [I]t's crystal clear this is a high-term [felony] case."

Although the trial court then sentenced Trott to a term to be served in county jail pursuant to section 1170, subdivision (h)(1) and (2), it is clear from its comments it considered each of Trott's offenses to have been a felony. Under these circumstances, we have no doubt that, had Trott's counsel made a motion to have any of the offenses

14

reduced to misdemeanors, that motion would have been denied. Trott's counsel's failure to make such a motion was perfectly reasonable.

Finally, Trott asserts, after she made the decision to reject the People's offer of a plea bargain and to instead go to trial, during which her counsel "thwarted" her efforts to prove her innocence, the trial court improperly imposed a harsher sentence. She asks this court, not only to reverse her convictions, but to reduce her sentence to the two years in county jail that the People initially offered. However, as stated above, with regard to her convictions of the offenses, the evidence supports the jury's findings and review of the record indicates her counsel was not ineffective. As to her sentence, the record fails to indicate the trial court imposed a harsher term because she chose to exercise her right to go to trial. The court imposed what it believed was a fair term. (See *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 792.)

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.          ALDRICH, J.

15