Filed 3/26/15  P. v. Dawson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071527 |
| v. | (Super. Ct. No. 10F04520) |
| ISAAC DABOUR DAWSON, | |
| Defendant and Appellant. | |

In this case, like so many, a young man's acting out, accompanied by his possession and use of a firearm, resulted in a prison term that will likely span the remainder of his life.  After starting a fist fight, which he lost, defendant Isaac Dabour Dawson retrieved a hand gun he had given a friend to hold for him during the fight.  He pointed the gun at his adversary, Davon Nelson, took a back pack belonging to Louis Salmon, a spectator who was also a friend of Nelson, and ran away.  Nelson gave chase, yelling for defendant to give the bag back and "take the L," meaning loss, at which point,

defendant turned around and fired a single shot, hitting Nelson in the leg. About a week later, defendant unsuccessfully attempted to rob two separate individuals, Lisa Fang and Juan Martinez. He approached Fang in the parking lot of a pizza place as she returned to her car. Fang managed to get in and lock the door before defendant knocked on her side window with a gun. After Fang refused to open the door, defendant walked to the back of the car and fired a shot at the ground. Fang drove away, shaken but unharmed. About an hour later, defendant tried to rob Martinez, an ice cream vendor. Stepping away from his cart when he became suspicious of defendant, Martinez walked towards a group of people who were standing in a driveway across the street. Following, defendant showed Martinez a gun and demanded money. Martinez told defendant to put the gun down and "fight like a man." Defendant punched Martinez in the head and walked away.

Defendant was convicted by jury of two counts of robbery (Counts 1 and 3), two counts of attempted robbery (Counts 5 and 8), two counts of assault with a firearm (Counts 2 and 6), two counts of possession of a firearm by a convicted felon[1] (Counts 4 and 7), and one count of possession of ammunition by a person prohibited from possessing a firearm (Count 9). Various firearm enhancement allegations were also found to be true, the most serious of which (attached to Counts 1 and 3) was that defendant personally discharged a firearm resulting in great bodily injury. The trial court sentenced defendant to serve an aggregate determinate prison term of 19 years, 8 months, plus a consecutive indeterminate term of 50 years to life, and imposed other orders.

On appeal, defendant contends: (1) his convictions in Counts 5 and 6 (Fang attempted robbery/assault with a firearm) and Count 8 (Martinez attempted robbery) must

---

[1] Defendant was previously convicted of felony possession of a controlled substance.

be reversed because the evidence is insufficient to support the jury's findings that (a) he was the perpetrator of these crimes, and (b) he intended to rob Fang; (2) his convictions in Counts 1 through 3 (Nelson robbery/assault with a firearm and Salmon robbery) must be reversed because three in-court identifications of defendant as the perpetrator should have been excluded as the result of an impermissibly suggestive pre-trial photographic lineup; and (3) the trial court should have held a hearing on defendant's right to substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) after he complained about his trial counsel for the first time during the sentencing hearing.

We disagree and affirm. As we explain, the evidence is more than sufficient to support the jury's conclusion defendant was the person who attempted to rob Fang and assaulted her with a firearm, and he was also the person who attempted to rob Martinez. And while defendant never specifically asked Fang for money, the evidence is nevertheless sufficient to establish he intended to rob her when he approached her car, knocked on the window with a gun, and told her to open the door. Defendant's claim that the trial court prejudicially erred in failing to exclude the in-court identifications made by Nelson, Salmon, and another friend who was at the scene, Derrion Dunn, is forfeited by his failure to request exclusion of these identifications at trial. Nor did his trial counsel provide ineffective assistance by failing to move to suppress the in-court identifications. Finally, the trial court had no duty to hold a hearing on defendant's right to substitute counsel under *Marsden* because defendant never indicated he wished to remove his court-appointed counsel and have substitute counsel appointed.

FACTS

***Robbery and Shooting at the Pannell Community Center***

On the afternoon of July 1, 2010, Nelson and several friends, including Salmon, stood on the sidewalk in front of the Sacramento Job Corps on Meadowview Road in

3

Sacramento. The group was waiting for others to get out of the Job Corps building when two young men approached on a bike. Defendant, who was sitting on the handlebars while the other young man peddled, said to the group: "Get the fuck off the sidewalk." After some arguing between Nelson and defendant, the two agreed to settle the matter with a fist fight at the Pannell Community Center a short distance away. When they reached one of the community center's large grass areas, defendant and Nelson took off their shirts. Salmon also took off his shirt, in case there was a need for him to join in the fight. Defendant handed a black revolver to his companion to hold during the fight, while Salmon placed his and Nelson's shirts in his back pack, along with some other personal items. The rest of the group gathered around to watch the fight.

The fight began with Nelson landing four or five punches while dodging those thrown by defendant. Defendant then grabbed Nelson and took him to the ground. After a brief wrestling match, Nelson managed to place defendant in a headlock. He then told defendant he was going to let go and not to throw any punches when released. Defendant immediately threw another punch, which Nelson blocked. Nelson then landed four more punches, the last of which caused defendant to stumble back. At this point, defendant stopped fighting and glared at Nelson for a moment. Nelson said: "What's up?" Defendant responded: "Fuck this shit. Give me the gun." When his companion said "no," defendant grabbed the gun anyway, pointed it at Nelson, and said: "Now what? Now what?"

Nelson told defendant he was not going to do anything with so many people around. Defendant then tried to hit him with the gun. When Nelson dodged this blow as well, defendant grabbed Salmon's back pack and ran behind a building. Nelson gave chase. As defendant ran up a hill past the building, Nelson called him a "bitch" and yelled for him to give the bag back and "take the L." Defendant turned around and fired

4

a single shot, hitting Nelson in the right leg, and then completed his escape with the back pack. Nelson did not realize he was hit until his leg "just didn't work" and he fell to the ground. His friends came to his assistance, as did several people who worked at the community center. One of these employees called 911. At some point, defendant's bike-riding companion also disappeared from the scene.

Police and medical personnel arrived a short time later. Nelson was transported to the hospital, where his wound was cleaned and bandaged. The injury to his leg required months of rehabilitation. Nelson and Dunn each gave a generally accurate description of defendant to police. Nelson told police the shooter was African-American, "about 20 years old," with a short "fade haircut," about "5'6, 180 pounds, kind of built, with a C-shaped scar on the right side of his head, light skinned." Dunn told police the shooter was African-American, "in his early 20s," "light skinned," "bald headed," "between 5'5 and 5'6 with a C-shaped scar on the right side of his head." He initially estimated the shooter's weight to be between 230 and 240 pounds, but then said, "well, maybe like 220," and finally settled on "more like 205."[2] Nelson, Dunn, and Salmon each identified defendant as the shooter in a subsequent photographic lineup. Nelson and Dunn positively identified defendant at trial. Salmon's in-court identification was more tentative; he believed defendant was the person who robbed him and shot Nelson, but was not sure because defendant "look[ed] different" at trial.

***Attempted Robbery and Shooting in the Little Caesar's Parking Lot***

On July 9, 2010, around 11:30 a.m., Lisa Fang pulled into the Little Caesar's parking lot on Mack Road in Sacramento. She was there to pick up pizza for an office

---

[2]   The probation report lists defendant's height as five feet, four inches, and his weight as 160 pounds. He was 20 years old at the time of the incident. Defendant has a C-shaped scar on the right side of his head.

lunch party. When Fang entered the parking lot, she became suspicious of defendant and another young man who were also in the parking lot. Unable to find a parking space directly in front of the store, Fang settled for the closest available spot in the parking lot's middle row. She then went inside, picked up the pizza, and quickly returned to her car. Defendant and his companion approached the car as Fang got in and locked the door. Defendant tried to open the driver's side door while the other young man stood behind the car. He then knocked on the window with a black revolver and said: "Open the door." Fang responded: "Please go away." When defendant repeated his demand two or three more times, Fang "just looked at him." Defendant then joined his companion behind the car, pointed the gun at the ground, and fired one shot. Fang believed defendant was trying to shoot out her tire, so she started the car and drove out of the parking lot.

Fang called her boss on her cell phone, pulled into another parking lot a short distance away, and waited for a coworker to meet her there. The coworker called 911. During the call, Fang got on the line, described the incident, and provided the following description of the shooter: "Black. . . . [¶] He was probably 20. [¶] . . . [¶] He wasn't that tall. . . . I want to say 5'5". Not that tall. [¶] . . . [¶] He was kind of medium [in build]." Fang also described the shirt worn by the shooter as being "a gray t-shirt with the, the sleeves were black." Fang described the other man as being about the same age, also African-American, but "a little bit taller." At trial, she added that the shooter had a "clean-cut" hair style and the second young man wore dreadlocks. After the attempted robbery of the ice cream vendor, described immediately below, defendant was seen wearing a black t-shirt with gray sleeves, which he took off and dropped as he ran from officers who were attempting to take him into custody. During a subsequent field show-up following defendant's arrest, Fang could not state whether defendant was the man who

6

approached her car with the gun and fired a shot at the back of the car.  However, she did positively identify the shirt, explaining she had the colors reversed.  She again positively identified the shirt at trial.

### *Attempted Robbery of the Ice Cream Vendor*

About an hour after the attempted robbery and shooting in the Little Caesar's parking lot, defendant approached Martinez as he was selling ice cream outside of Rio Cazadero High School, less than a mile from the Little Caesar's.  Defendant, who was now wearing a black baseball cap, was with another young man who had "braids" or "dreadlocks."  However, this young man continued walking down the street while defendant approached Martinez and asked about ice cream prices.  Martinez, who was riding a bike with an ice cream cart attached to the back, stopped and walked over to the cart.  When Martinez said the prices were printed on the outside of the cart, defendant opened the cover and started looking inside.  Finding this to be "weird" and "suspicious," Martinez walked away from the cart and toward a group of four or five people standing in a driveway across the street.  Defendant followed.  When they reached the middle of the street, defendant lifted his shirt to show Martinez a black revolver that was tucked into his waistband and said:  "Give me the money.  Give me the money."  Apparently noticing the people across the street for the first time, defendant lowered his shirt to again cover the gun.  Martinez told defendant:  "Throw that fucking gun away and fight like a man." Defendant punched Martinez in the head and walked away, rejoining his dreadlocked companion.  The two left the scene together as Martinez yelled that his 15-year-old niece could throw a harder punch.

Martinez told the people in the driveway to call the police, spent a few minutes contemplating his next move, and ultimately decided to attempt to locate defendant on his bike.  He was "angry, annoyed, frustrated," and intended to hit defendant in the back with

one of the iron bells that was attached to his ice cream cart. Fortunately, when Martinez located defendant and his companion on Bamford Drive a short distance from the high school, he decided instead to flag down a community service officer who happened to be driving by in a patrol car. Pointing down the street to the west, Martinez told the officer: "Those two guys over there, they have a gun and they just robbed me. . . . I'm following them because I want to beat them up." Martinez described defendant as being African-American, "17 to 19" years old, wearing a black hat and gray pants. Martinez also described a tattoo on defendant's neck that he saw when defendant was bent over and looking through the ice cream cart. A short time later, defendant was taken into custody less than half a mile to the west of where Martinez flagged down the patrol car. During a subsequent field show-up, Martinez identified defendant based on the tattoo on his neck. He also identified defendant at trial based on this tattoo.

Prior to defendant's arrest, he led officers on a chase through the neighborhood, during which he ran through an apartment complex carrying a back pack and black shirt with gray sleeves. When he got to a wall at the edge of the complex, defendant threw the back pack over and climbed the wall, dropping the shirt on the ground behind him. As mentioned, the shirt was recovered and shown to Fang, who identified it as the shirt worn by the man who attempted to rob her in the Little Caesar's parking lot. The back pack was found hanging from a fence a short distance away. A black hat was also recovered in a back yard a short distance from where the back pack was found. When defendant was searched incident to his arrest, police found two black nylon gloves, one in each of defendant's back pockets, and a plastic bag containing live .38-caliber ammunition in his right front pocket. The revolver was not recovered. Based on the fact defendant had a C-shaped scar on the right side of his head, a picture of the scar was taken and e-mailed to the detective working the robbery and shooting at the Pannell Community Center.

This detective then used defendant's booking photo in a photo line-up he showed to Nelson, Salmon, and Dunn, each of whom identified defendant as the shooter in that incident.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends his convictions in Counts 5, 6, and 8 must be reversed because the evidence is insufficient to support the jury's findings that (a) he was the perpetrator of the crimes committed against Fang and Martinez, and (b) he intended to rob Fang. We disagree.

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

9

## A.

### *Defendant's Identity as the Perpetrator in the Fang and Martinez Incidents*

In Counts 5 and 6, defendant was convicted of attempted robbery and assault with a firearm based on the incident in the Little Caesar's parking lot. In Count 8, defendant was convicted of attempted robbery based on the incident outside of Rio Cazadero High School. In addition to the elements of these crimes, evidence of which defendant does not challenge as insufficient (with the exception of the intent element of Count 5, discussed below), the prosecution was required to prove beyond a reasonable doubt that defendant was the perpetrator. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1345.) "Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493-494, citing *People v. Braun* (1939) 14 Cal.2d 1, 5.)

### 1. *Fang Incident*

Challenging the prosecution's identity evidence relating to the Fang incident, defendant argues: "Fang was unable to identify [him] as the perpetrator of [that] incident, either in court or in the in-field show up." While true, she did positively identify the shirt worn by the perpetrator. (See *People v. Lindsay*, *supra*, 227 Cal.App.2d at p. 494 [identity may be established by clothing].) Defendant was seen wearing this shirt after committing *another attempted robbery*, about an hour later and less than a mile away, during which he used a black revolver, the same type and color of gun Fang described as being used to knock on her car window in the Little Caesar's parking lot. A second young man, with dreadlocks, accompanied defendant in each incident. Evidence of this subsequent attempted robbery was strong evidence that defendant was also the perpetrator in the Fang incident. (See Evid. Code, § 1101, subd. (b) [evidence of other

10

charged or uncharged offenses relevant to show identity]; see also *People v. Davis* (1995) 10 Cal.4th 463, 508 [evidence in support of offenses against two victims cross-admissible on issue of identity where there was "close proximity in time and place of the two incidents" and "similarities between them"].)  After the Martinez attempted robbery, defendant took off the shirt that was identified by Fang and dropped it while attempting to evade arrest, which the jury could have reasonably concluded evidenced his consciousness of guilt and understanding the distinctive shirt could tie him to the crimes committed in both incidents.  Evidence of a defendant's consciousness of guilt is "probative of his [or her] identity as the perpetrator of the charged offenses."  (*People v. Harrison* (2005) 35 Cal.4th 208, 230.)

Defendant takes issue with the fact Fang described the shirt worn by the perpetrator as being gray with black sleeves, while the shirt recovered by police and identified by Fang was black with gray sleeves.  However, both during the in-field show up and at trial, she explained she had the colors reversed in her mind but was positive it was the shirt worn by the perpetrator.  Given the traumatic nature of the event Fang had just experienced, the jury could have reasonably concluded she was mistaken about the location of the gray and black in her initial description of the shirt, and recognized both the shirt and her mistake during the in-field show up and at trial.  Where, as here, "the circumstances surrounding the identification and its weight are explored at length at trial," and where the "identification is believed by the trier of fact, that determination is binding on the reviewing court."  (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.)  Nor are we troubled by defendant's observation that Fang testified the shirt she identified during the in-field show up was "a shirt that he had in his backpack," while the other evidence indicated the shirt was dropped by defendant while he ran from police.  Fang had no way of knowing whether the shirt was in defendant's back pack when he was

11

arrested and likely assumed as much, perhaps seeing the back pack along with the shirt during the in-field show up. In any event, this minor inconsistency does not undermine Fang's identification of the shirt as having been worn by defendant when he attempted to rob her and fired a gun at the back of her car.

Defendant also attempts to undermine testimony from the officer who saw defendant wearing the black and gray shirt after he attempted to rob Martinez, arguing, "while [the officer] claims to have seen a person whom he believed was [defendant] crouching behind a car wearing this shirt, he was 50 feet away, in the process of securing another black male he had detained as a suspect in this very case, and did not observe any tattoos or facial scars that were attributable to [defendant]. And this male got up and walked away from the area." For several reasons, we are not persuaded. First, the officer did not testify that he saw *a person* wearing the shirt *whom he believed* was defendant. He testified unequivocally that he saw *defendant* wearing the shirt, crouching behind a car, looking at him while he secured another suspect in the back of his patrol car.[3] Second, the officer did not testify that the person wearing the shirt, i.e., defendant, *walked away from the area*. The officer testified he pretended not to see defendant so he would not run, which appeared to have worked since defendant *walked away from the officer* and towards the apartment complex where he was later seen running with the shirt in his hand and then dropping the shirt on the ground as he climbed over a wall. Third, while defendant was "40 to 50 yards away" from the officer, it was for the jury to decide whether this distance would have prevented the officer from being able to identify defendant. Finally, the fact the officer did not notice a scar on defendant's head or tattoo on his neck is not surprising given the distance between the two, and is certainly not

---

[3] This person was shown to Martinez and then released after Martinez stated he was not the man who tried to rob him.

12

dispositive. Stated simply, the jury could have reasonably concluded the officer was close enough to identify defendant as the person wearing the shirt, but far enough away to have missed two discrete features.[4]

Far from "practically no evidence at all" (*People v. Lindsay*, *supra*, 227 Cal.App.2d at p. 493), the prosecution presented substantial direct and circumstantial evidence establishing beyond a reasonable doubt defendant's identity as the perpetrator of the crimes committed against Fang.

### 2.   *Martinez Incident*

Challenging the prosecution's identity evidence relating to the Martinez incident, specifically, Martinez's identification of defendant's tattoo, defendant argues: "Martinez was unable to provide any description of the tattoo prior to seeing it in court, other than it had several words or letters. He did not describe the size of the tattoo, any of the letters or word[s], and had no specific information about the tattoo." We first note Martinez did not testify the tattoo was several words or letters. While he described the tattoo as being "a specific name" formed by five to seven "words," he clarified that he meant "letters," not "words." However, defendant is correct Martinez did not describe the size of the

---

[4]     Nor are we persuaded by the remainder of defendant's arguments regarding his identity as the person who attempted to rob Fang and assaulted her with a firearm. While we agree certain testimony regarding a smudge on Fang's car door, which was said to have had a pattern similar to that of the gloves found in defendant's pockets, although the smudge was not photographed to allow for a side-by-side comparison, "does not amount to substantial evidence," there is sufficient evidence supporting defendant's identity as the person who committed the crimes against Fang without this smudge evidence. Similarly, even though the gunshot residue testing performed on defendant's gloves indicated the presence of residue consistent with either firing a gun or operating a power tool, in light of the other evidence of defendant's identity as the person who committed the crimes against Fang, which we have already found to be sufficient, the jury would have been more than justified in concluding the residue found on defendant's gloves came from firing the gun at the back of Fang's car and not from operating a power tool.

13

tattoo or remember the name formed by the letters. Nevertheless, according to his testimony, Martinez saw the tattoo immediately before defendant attempted the robbery. He then identified the tattoo a short time later during the in-field show up. He again identified the tattoo at trial. It was for the jury to decide whether they believed Martinez's identification. (See *In re Gustavo M.*, *supra*, 214 Cal.App.3d at p. 1497.) Nor are we persuaded by the fact Martinez could not identify defendant other than by his tattoo. This too goes to the weight of the identification, a matter for the jury to decide. (*Ibid*.)

Defendant also argues the identification process was "tainted and unduly suggestive." Not so. Indeed, the only case he relies on in purported support of this claim involved a lineup situation in which the court held the defendant's tattoo "did not make the live lineup impermissibly suggestive." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) Moreover, here, Martinez did not identify defendant out of a lineup in which he was the only person with a tattoo. Instead, Martinez was properly shown defendant's tattoo for the specific purpose of identifying the tattoo. (See *People v. Davis* (2009) 46 Cal.4th 539, 611-612 [in-court identification procedure, by which defendant was compelled to roll up his sleeves and display his tattoos to the witness was not impermissibly suggestive].)

Finally, as with the Fang incident, a tremendous amount of circumstantial evidence corroborated Martinez's identification of defendant as the perpetrator. About an hour before he tried to rob Martinez, less than a mile away, defendant also tried to rob Fang, during which he also used a black revolver. A second young man, with dreadlocks, accompanied defendant in each incident. Martinez rode after defendant and his companion after the attempted robbery and flagged down a patrol car when he had them in sight. Pointing in their direction, Martinez provided a brief description, including the

14

fact defendant had a tattoo and was wearing a black hat. Additional units were dispatched to the area. One officer saw defendant, wearing the shirt identified by Fang, walk into an apartment complex, where he was later seen running from officers and dropping the shirt on the ground as he climbed over a wall to get out of the complex. A short time later, defendant was taken into custody less than half a mile from where Martinez flagged down the patrol car. A black hat was found a short distance from where defendant was arrested. And while the revolver was not recovered, .38-caliber ammunition was found in defendant's pocket when he was searched incident to his arrest.

Again, far from "practically no evidence at all" (*People v. Lindsay*, *supra*, 227 Cal.App.2d at p. 493), the prosecution presented substantial direct and circumstantial evidence establishing beyond a reasonable doubt defendant's identity as the perpetrator of the attempted robbery of Martinez.

### B.

### *Defendant's Intent to Rob Fang*

Returning to the Fang incident, defendant argues "there are only unsupported speculative assumptions that [his] intent . . . was to rob Fang." Not so.

"Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (Pen. Code, § 211.) "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Cal.4th 685, 694.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420; *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1365.)

Here, as defendant points out, he did not demand money or property from Fang when he knocked on her car window with a gun. Nevertheless, the circumstances are more than adequate to support the jury's conclusion he intended to commit a robbery. Shortly after defendant knocked on Fang's window with a gun and demanded that she open the door, he showed the same gun to Martinez and demanded money. The fact he expressed his intent to rob Martinez is powerful circumstantial evidence he also harbored the intent to rob Fang. (See Evid. Code, § 1101, subd. (b) [evidence of other charged or uncharged offenses relevant to show intent]; *People v. Nye* (1951) 38 Cal.2d 34, 37-38, disapproved on other grounds in *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [evidence of intent to commit rape shown by defendant's attempt to rape another woman in similar circumstances].)

We conclude the circumstantial evidence is more than sufficient to support the jury's finding defendant possessed the specific intent to rob Fang.

## II

### *Admission of In-Court Identifications*

Defendant's claim that the trial court prejudicially erred and violated his right to due process by failing to exclude the in-court identifications made by Nelson, Salmon, and Dunn due to an impermissibly suggestive pre-trial photographic lineup is forfeited by defendant's failure to request exclusion of these identifications at trial. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1250; *People v. Cunningham* (2001) 25 Cal.4th 926, 989.) Anticipating forfeiture, defendant asserts his trial counsel provided constitutionally deficient assistance by failing to move to suppress the identifications. He is mistaken.

16

# A.

## *Additional Background*

Detective Scott MacLafferty prepared and administered the photographic lineup claimed by defendant to have tainted the in-court identifications made by Nelson, Salmon, and Dunn. MacLafferty explained he took defendant's most recent booking photograph and placed it randomly in the number five position on a grid containing six photographs. He used a computer program to select the remaining photographs. Based on defendant's gender, race, height, and weight, the program generated other booking photographs that were the same gender and race, and close to defendant's height and weight, within two inches and ten pounds, respectively.

Detective MacLafferty took the lineup to the Sacramento Job Corps and showed it to Nelson, Salmon, and Dunn. Nelson was the first to view the lineup. After receiving an admonition that "the suspect may or may not be in this lineup" and that "hairstyles, backgrounds, that kind of thing can change," Nelson "quickly identified the number five photograph." MacLafferty then showed Nelson the close-up photograph of the scar on the right side of defendant's head taken when he was arrested. The record does not reveal whether Nelson identified the scar when he was shown the photograph by Detective MacLafferty, although he did identify the scar at trial, stating: "That's how I remembered him."

Next to view the lineup was Salmon. After receiving the same admonition, Salmon also identified the number five photograph, stating: "I remember he had shorter hair but that's him, same tattoo." At this point, Detective MacLafferty realized the tattoo on defendant's neck was visible in the photograph. He explained: "You know, the descriptions I got from all the witnesses in this case, nobody mentioned a tattoo. The photographs that I received from the patrol officers, at first glance I didn't see a tattoo.

When I pulled up the booking photograph I didn't notice that tattoo. [¶] Once [Salmon] pointed that out during showing him the lineup I saw it, I go, oh, yep, that was a tattoo. [¶] That was -- like professionally that was my mistake and I take full responsibility for that." Despite knowing about the presence of the tattoo in defendant's photograph, the detective went on to show the lineup to Dunn. After receiving the same admonition, Dunn initially chose the number five photograph, changed his mind and chose the number two photograph, and then settled on his initial choice, number five. Detective MacLafferty asked: "Now, is it number 5 or is it number 2?" Dunn responded: "Number 5." He then added: "I remember his face" and "I remember that tattoo. . . . Yeah. It was him." The detective followed up: "So, it's -- it's definitely number 5?" Dunn answered: "Definitely."

As mentioned, Nelson and Dunn also positively identified defendant at trial. Salmon's in-court identification was more tentative; he believed defendant was the person who robbed him and shot Nelson, but was not sure because defendant "look[ed] different" at trial.

Defense counsel did not move to exclude evidence of the photographic lineup identifications. Nor did he move to exclude the in-court identifications on the basis they were tainted by the admittedly flawed photographic lineup. He did cross-examine Detective MacLafferty regarding the lineup and argued vigorously against the reliability of the identifications during closing argument. Following the jury's guilty verdict, defense counsel filed a motion for new trial, asking the trial court to "afford [him] the ability to attack the admissibility of the identifications, put the [P]eople to task to prove that the in court identifications are independent from the suggestive line-up, and afford the [trial] court the ability to rule on the admissibility in order to [e]nsure due process is not violated." The trial court denied the motion.

18

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  This right "entitles the defendant not to some bare assistance but rather to *effective* assistance.  [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.'  [Citations.]"  (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.)  "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."'"  (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)  The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant.  (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden.  Beginning with the first stage of the analysis, we cannot conclude defense counsel's performance fell below an objective standard of reasonableness.  Having reviewed the lineup shown to Nelson, Salmon, and Dunn, while defendant's tattoo is faintly visible, had its presence not been brought to our attention, we doubt we would have noticed it.  Thus, we cannot fault defense counsel for

19

not knowing the tattoo was in the photograph before Detective MacLafferty testified. This circumstance prevented counsel from moving in limine to exclude the in-court identifications as having been tainted by an unduly suggestive lineup. Alerted to the problem during Detective MacLafferty's examination, after Nelson, Salmon, and Dunn had already identified defendant, counsel had a strategic decision to make. He could have asked the trial court to strike the lineup evidence and in-court identifications and instruct the jury to disregard this evidence. However, while we generally presume jurors are able to follow such an instruction (see, e.g., *People v. Davis* (2005) 36 Cal.4th 510, 544-545), counsel may have been skeptical of their ability to do so. (See Sklansky, *Evidentiary Instructions and the Jury as Other* (2013) 65 Stan. L.Rev. 407, 410-414.) Moreover, this would have prevented counsel from commenting on the defective lineup in his closing argument. In that argument, counsel argued the defective lineup tainted not only the subsequent identifications, but also the police investigation as a whole, i.e., by giving the investigating officers a "we got our guy" attitude and causing them to simply go "through the motions."

Accordingly, it is plausible that defense counsel made a rational tactical decision not to move to strike the lineup and in-court identifications, and to instead attack their reliability through vigorous cross-examination and argument to the jury. "'[W]e accord great deference to counsel's tactical decisions' [citation], and . . . 'should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926; see also *People v. Fosselman* (1983) 33 Cal.3d 572, 581 [conviction will be reversed for ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission"].)

Turning to the second stage of the analysis, defendant has also failed to show prejudice flowing from his counsel's failure to move to exclude the identification evidence. This is because the motion would have been properly denied. We know the trial court would have denied such a motion because it performed the appropriate analysis in response to defendant's new trial motion and concluded: "I find clear and convincing evidence that the in-court identifications of the defendant had an origin independent of the alleged illegal lineup because each and all of these . . . witnesses had ample opportunity to see the defendant's face under optimal conditions, without obstruction, and reported descriptions to law enforcement that not only matched the defendant's physical appearance at trial, but included significant points of comparison, like the large C-shaped scar on the defendant's head. [¶] I further find that there is not a substantial likelihood that misidentification occurred at trial. To the contrary, I find the evidence of the defendant's guilt on each of the three charges was proved beyond a reasonable doubt, and the jury's determination of guilt was valid."

We agree with this assessment. "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) Here, even assuming the presence of the tattoo in defendant's photograph made the lineup unduly suggestive, the identifications were nevertheless reliable under the

totality of the circumstances.  Nelson, Salmon, and Dunn each had an excellent opportunity to view defendant at the time of the offenses committed at the Pannell Community Center.  Nelson had the best opportunity to view defendant, having engaged him in a face-to-face fist fight in broad daylight.  Salmon, who was standing next to Nelson when the fight began, also had a clear view of defendant, both during the fight and afterwards, when defendant took the back pack from Salmon's immediate presence, again, in broad daylight.  And while Dunn was a short distance away when the fight happened, he was with Nelson and Salmon in front of the Job Corps building when defendant and his companion rode up on a bike and told the group to get off of the sidewalk.  He also accompanied the group to the park to watch the fight.

In addition to unobstructed view, these witnesses were at the Pannell Community Center to either fight defendant or watch the fight, so their focus was on defendant and their degree of attention was high.  With respect to accuracy of prior descriptions of defendant, we first note the record does not reveal whether or not Salmon gave a prior description.  However, those given by Nelson and Dunn were, with the exception of weight, very accurate.  Nelson told police the shooter was African-American, "about 20 years old," with a short "fade haircut," about "5'6, 180 pounds, kind of built, with a C-shaped scar on the right side of his head, light skinned."  Dunn told police the shooter was African-American, "in his early 20s," "light skinned," "bald headed," "between 5'5 and 5'6 with a C-shaped scar on the right side of his head."  He estimated the shooter's weight to be about 205 pounds.  The probation report lists defendant's height as five feet, four inches, and his weight as 160 pounds.  He was 20 years old at the time of the incident.  Defendant has a C-shaped scar on the right side of his head.

With respect to the level of certainty demonstrated at the time of the identification, Nelson and Salmon did not hesitate in identifying defendant's photograph in the lineup.

22

And while Dunn initially vacillated between photographs, he quickly settled on defendant's photograph. When asked his level of certainty, Dunn answered: "Definitely." Finally, the incident at the Pannell Community Center happened on July 1, 2010, while the lineup was conducted on July 23, 2010. We agree with the trial court's assessment this was not "such an extended period of time as to place in doubt the validity of the resulting identifications."

We conclude that had defense counsel moved to exclude the identification evidence, the trial court would have properly denied the motion. Therefore, defendant sustained no prejudice from the purported defective assistance.

## III

### *Absence of a Hearing on Defendant's Right to Substitute Counsel*

Finally, defendant claims the trial court should have held a hearing on defendant's right to substitute counsel under *Marsden*, *supra*, 2 Cal.3d 118 after he complained about his trial counsel for the first time at the sentencing hearing. We are not persuaded.

### A.

### *Additional Background*

Defendant addressed the trial court at the sentencing hearing, offering various complaints about his counsel's performance during the trial. Defendant first complained of "numerous times" that he called his attorney to request a meeting to discuss the case, "which he never did," although defendant went on to state his attorney did meet with him, but only after his "boss force[d] him to" do so. Defendant then complained he was not given "all the proper paperwork [he] needed to go to trial." Defendant also complained his attorney "shooed" him away when he tapped on his attorney's shoulder at various points during the trial to ask that a "motion for a dismissal" be made based on certain testimony that was given, e.g., Detective MacLafferty's testimony concerning the

23

photographic lineup.  Finally, defendant complained:  "I was supposed to start trial November 15th.  I didn't start trial until December 6th.  That's 21 days.  That's 11 court days.  After your tenth court day, you're [sup]posed to push for a motion for a dismissal."  Defendant also stated:  "I didn't know anything about a *Marsden* motion.  Had I known about a *Marsden* motion before we started trial, I would have pushed for a *Marsden* motion."  Aside from these complaints, defendant argued the evidence was insufficient to sustain his convictions.

The trial court responded:  "First of all, you're correct.  You never filed or prosecuted a *Marsden* motion, so there was nothing for me to rule on, and I can't rule on it now in retrospect.  [¶]  Second of all, your position is there was insufficient evidence to convict you.  Quite frankly, the evidentiary record relative to your involvement in this case was overwhelming."  After addressing some of this evidence, the trial court stated:  "You contend that you wanted to prosecute motions for dismissal of the case during the course of the trial.  [¶]  I'm sure that there's a lot of discussion between a defense lawyer and a client during the course of a trial.  I don't become involved in it unless it was brought forward.  [¶]  I can't rule on it now.  I can't turn the clock back.  I can't make changes to things that have already occurred."

## B.

### *Analysis*

In *People v. Mungia* (2008) 44 Cal.4th 1101, our Supreme Court reiterated the rules governing the grant and review of *Marsden* motions:  "'In [*Marsden*, *supra*, 2 Cal.3d 118], we held that a defendant is deprived of his [or her] constitutional right to the effective assistance of counsel when a trial court denies his [or her] motion to substitute one appointed counsel for another without giving him [or her] an opportunity to state the reasons for his [or her] request.  A defendant must make a sufficient showing that denial

24

of substitution would substantially impair his [or her] constitutional right to the assistance of counsel [citation], whether because of his [or her] attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations].  We require such proof because a defendant's right to appointed counsel does not include the right to demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court.  [Citation.]'  [Citation.]  When reviewing whether the trial court abused its discretion in denying a *Marsden* motion, we consider whether it made an adequate inquiry into the defendant's complaints.  [Citation.]"  (*People v. Mungia*, *supra*, 44 Cal.4th at pp. 1127-1128.)

"Although no formal motion is necessary, there must be 'at least some clear indication by defendant that he [or she] wants a substitute attorney.'  [Citation.]"  (*People v. Mendoza* (2000) 24 Cal.4th 130, 157; *People v. Dickey* (2005) 35 Cal.4th 884, 920.)  "'The mere fact that there appears to be a difference of opinion between a defendant and his [or her] attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing.'  [Citation.]"  (*People v. Valdez* (2004) 32 Cal.4th 73, 97.)  Here, as the trial court correctly observed, defendant admittedly did not indicate during trial that he wanted a substitute attorney.  Thus, there was no obligation for the trial court to hold a *Marsden* hearing during the trial.  While defendant's comments at sentencing "contain complaints regarding the adequacy of defendant's representation at trial," he did not "request[] substitute counsel . . . to provide representation at sentencing, or for any other purpose going forward."  (*People v. Richardson* (2009) 171 Cal.App.4th 479, 485.)  Accordingly, there was no obligation for the trial court to hold a *Marsden* hearing at the sentencing hearing.

DISPOSITION

The judgment is affirmed.


      HOCH     , J.



We concur:



      BUTZ     , Acting P. J.



      MAURO   , J.